Robert SHAD, Molly Shad, and Samantha Shad, Plaintiffs/Appellants,

v.

DEAN WITTER REYNOLDS, INC., a corporation; Milton Ponitz and Lee McMahon, Defendants/Appellees.

No. 85–5652.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 8, 1986.

Decided Sept. 9, 1986.

Allen L. Neelley, Judith K. Otamura-Kester, Hahn, Cazier & Smaltz, Los Angeles, Cal., for plaintiffs/appellants.

Eugene W. Bell, Kevin K. Fitzgerald, Jones, Bell, Simpson & Abbott, Los Angeles, Cal., for defendants/appellees.

Before BROWNING, Chief Judge, and KENNEDY and BEEZER, Circuit Judges.

BEEZER, Circuit Judge:

Plaintiffs Robert, Molly, and Samantha Shad appeal from a jury verdict in favor of Dean Witter Reynolds, Inc. ("DWR") and two of its account executives. The Shads alleged that DWR account executives churned four Shad accounts between August 1978 and July 1982 in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The assignments of error require us to review discovery procedures, the exclusion of expert testimony, the denial of a motion for mistrial, and the rejection of proffered instructions. We remand for a new trial on account of the exclusion of expert testimony. We otherwise affirm the district court.

In December 1977, Robert and Molly Shad, husband and wife, opened a brokerage account at DWR with a transfer of securities and the deposit of funds. The Shads told the account executive, Douglas McCombs, that Robert Shad was retired and it was necessary to pay family living expenses from dividend income. When Samantha Shad's account was opened, McCombs was told that she was not then gainfully employed and that her income consisted primarily of spousal and child support. Consequently, McCombs managed the Shads' accounts in a conservative manner, investing primarily in utilities and executing few margin transactions.

When McCombs left the Encino office in July 1978, management of the Shads' accounts was transferred to Milton Ponitz. Ponitz recommended that the Shads follow the DWR "covered writing option program," (CWOP) which involved the purchase of stock and simultaneous sale of options based on that stock. The Shads were told this conservative investment would produce more income. The Shads agreed, and their portfolio was managed accordingly. Transactions in the CWOP were based upon a computer list, ("shopping list"), generated daily by DWR. The shopping list identified the "best" stocks in ten categories based upon calculation of various measures of volatility, delta and beta, and the rate of return if the option was exercised or expired. During the four years Ponitz managed the Shad accounts, he executed 1787 transactions, totalling $13,000,000. DWR earned approximately $696,000 in interest and commissions.

The Shads allege that their accounts were churned. They allege that Ponitz controlled the account because they were "without knowledge, experience or sophistication in the area of securities, options, or securities accounts" and they had placed "their entire discretion and the control for selection, execution, purchases and sales of options and securities" in their accounts

with Ponitz. Furthermore, they allege that the trading in their accounts was excessive in light of their investment objectives, which Ponitz identified as preservation of capital, safety of principal, and generation of income to maintain their living standards. They claim damages including $700,000 in lost equity and $696,000 in commissions and interest.

# I

## DISCOVERY

After the action was commenced DWR refused to produce account executive Ponitz's daily records of conversations with the Shads, claiming those conversations were interwoven with notes about other customers. The Shads then moved to compel production of documents. The court failed to rule on the motion either when it was originally noted for hearing or during the first pretrial conference. The Shads signed the second pretrial order which stated that discovery was complete and failed to raise their motion again until January 16, 1985, the fifth day of the trial.

A district court order relating to discovery is reviewed for an abuse of discretion. *In the Matter of Bishop, Baldwin, Rewald, Dillingham & Wong, Inc.,* 779 F.2d 471, 475 (9th Cir.1986); *Hatch v. Reliance Insurance Co.,* 758 F.2d 409, 416 (9th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 571, 88 L.Ed.2d 555 (1985).

█ Having waited thirteen months to remind the court of their motion, plaintiffs cannot now complain of the court's failure to rule.

# II

## EXPERT TESTIMONY

A. *Evidence Excluded at Trial*

On January 8, 1985, the first day of trial, the Shads argued that expert testimony on churning was essential. They believed the court intended to allow that testimony because of the court's prior order and because their expert witnesses were listed in

the pretrial order. The court stated that it was inclined to exclude such expert testimony as unnecessary and time consuming.

The Shads stated they wanted their experts to testify, not to the definition of churning, but rather to the significance of various types of transactions, whether they were appropriate to the Shads' circumstances and objectives, and whether the making of those transactions evidenced reckless disregard of the Shads' interests.

On January 9, the court ruled that the Shads could introduce evidence of New York Stock Exchange Rule 405, NASD Rules, Art. III, Sec. 2, and certain internal rules of DWR, to provide a standard against which the jury could judge the adequacy of defendants' knowledge of the Shads' investment objectives and circumstances. At the close of trial on January 9, the court admonished the Shads' counsel, Neelley, for his "very protracted and prolix examination of a witness." The court stated it would continue to question witnesses and admonish counsel in order to expedite the trial. At that time, Neelley stated

I had a pretrial order which had been twice amended, in open court, and signed by your honor, which said that this case would be an 11–day jury case, and I confess to this court that I was absolutely shocked and surprised when your honor said that we're going—first of all we're going to re-pretry it and then we're going to try it in four days and in that context told me that I would not be allowed to put on evidence of objective criteria of churning by experts.

The court responded that it would allow objective expert testimony but would not allow opinions on whether the accounts were churned.

At the close of court on January 14, the court indicated it was inclined to exclude the Shads' expert's testimony on Fed.R. Evid. 403 grounds.

The rule is very clear to that effect, but the rule indicates that it is where the lay person will find expert opinion helpful in the sense that without such expert opinion it would be unable to understand ...

for a ... so-called expert, to say ... this does constitute churning ... is of doubtful admissibility as the court weighs under 403 the probative value ... the prejudice ... and the need for such testimony in the sense of it being necessarily of help to triers of fact who could not understand without it.

On January 17, the Shads called expert Edward Horwitz, a securities and commodities broker, who had analyzed transactions in the subject accounts against criteria for transactions in the CWOP. Horwitz testified to the mechanics of buying an option, the difference between covered and naked options, and other terms. He explained the various indices by which certain options were judged acceptable under the CWOP, including delta and beta, measures of volatility, and how the program enhanced investor's income. He explained that the CWOP contemplates that the investor will increase his income by adding the premium he earns from sale of the option to the dividend he receives as owner of the underlying security and that he will allow the option to expire unless it is exercised.

Horwitz identified four patterns of trading in the Shad accounts that deviated from the CWOP: walking up transactions, in and out trading, naked option positions, and premature liquidation. Horwitz was not allowed to testify regarding DWR's education of its account executives on churning. He then testified that those nonconforming transactions were of no economic benefit to the Shads, but he was not allowed to testify that they were excessive in view of the Shads' objectives. After the court sustained six objections to such questions, the jury was excused, and Neelley admonished.

> The court made it very clear ... that it would not permit expert testimony [on whether churning took place] ... and there was a persistence of inquiry as to the opinion of this witness as to whether there was churning, and by which is

meant excessive trading, and before you got to that the court said there will be no more of it. The court doesn't tolerate violations of its directions or indeed its orders.... You will not only desist from it from this point forward, you will be in contempt if you do not desist.

Neelley made an offer of proof that Horwitz would testify that the nonconforming transactions were excessive in light of the Shads' investment objectives, that their only purpose was to earn commissions for the defendants, that DWR's definition of churning was an acceptable definition in the securities industry, and that because of the complexity of the CWOP, a person of average experience and intelligence would be unable to make independent investment decisions.

On January 22, the Shads' expert Anthony Englese, a lawyer who was previously general counsel and director of compliance for DWR, testified to his analysis of the difference in management of the Shads' investments under Ponitz, under their previous account executive, McCombs, and under E.F. Hutton. Because of the court's earlier threat of contempt, Neelley did not ask Englese his opinion on whether the accounts were churned. Nor did he ask about excessive trading, control by Ponitz, or reckless disregard of the Shads' interests. In their written offer of proof, the Shads stated that Englese would testify that the churning of an account progresses through four distinct phases and that such a progression was discernible in the Shad accounts. The Shads were effectively deprived of an independent evaluation of DWR investment recommendations[1] since they could not present testimony on the significance of various indices such as the Goldberg turnover rate and the Looper turnover rate. The Shads even lacked access to the information upon which the CWOP transactions were based.

---

1. The district court found that NYSE Rule 405 and NASD Rules, Art. III, Sec. 2, were relevant and inadvertently failed to instruct the jury on those issues. Because the Shads failed to timely object to this omission, their inability to present these rules to the jury will not now be reviewed under the guise of exclusion of evidence.

## B. *Evidentiary Principles*

"All relevant evidence is admissible, except as otherwise provided.... Evidence which is not relevant is not admissible." Fed.R.Evid. 402. " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R. Evid. 401; *United States v. Federico*, 658 F.2d 1337, 1342 (9th Cir.1981), *overruled on other grounds; United States v. De Bright*, 730 F.2d 1255, 1259 (9th Cir.1984) (en banc); *United States v. Hobson*, 519 F.2d 765, 776 (9th Cir.), *cert. denied*, 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975); *see Sears v. Southern Pacific Co.*, 313 F.2d 498, 504 (9th Cir.1963).

Expert testimony, which will assist the trier of fact to understand the evidence or to determine a fact in issue, may be admitted under Fed.R.Evid. 702, if relevant and not otherwise excluded.

To warrant the use of expert testimony, two elements are required. First, the subject of the inference must be so distinctly related to some science, profession, business or occupation as to be beyond the knowledge of the average layman, and second, the witness must have such knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier of fact in his search for truth.

*Fineberg v. United States*, 393 F.2d 417, 420 (9th Cir.1968) (quoting *Jenkins v. United States*, 307 F.2d 637, 641–43 (D.C.Cir. 1962)); *see Kline v. Ford Motor Co., Inc.*, 523 F.2d 1067, 1070 (9th Cir.1975); Fed.R. Evid. 702. The federal rules clearly indicate the desirability of testimony by a qualified expert if it will assist the trier of fact as required by Rule 702. *Hingson v. Pacific Southwest Airlines*, 743 F.2d 1408, 1412 (9th Cir.1984).

"Expert testimony ... [that is] otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." Fed.R.Evid. 704; *United States v. Rogers*, 769 F.2d 1418 (9th Cir.1985); *United States v. Barrett*, 703 F.2d 1076 (9th Cir.1983). But relevant evidence may be excluded under Fed.R.Evid. 403 if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The exclusion of evidence, including expert testimony, is reviewed for abuse of discretion. *Hamling v. United States*, 418 U.S. 87, 108, 94 S.Ct. 2887, 2902, 41 L.Ed.2d 590 (1973); *United States v. Tsinnijinnie*, 601 F.2d 1035, 1040 (9th Cir.1979), *cert. denied*, 445 U.S. 966, 100 S.Ct. 1657, 64 L.Ed.2d 242 (1980).

Even if the court abused its discretion in excluding evidence in a civil action, the error is harmless if the decision is more probably than not untainted by the error. *Davis & Cox v. Summa Corp.*, 751 F.2d 1507, 1516 (9th Cir.1985). Thus, we must determine whether the excluded evidence was relevant, whether its probative value was substantially outweighed by Rule 403 considerations, and, if exclusion was an abuse of discretion, whether that abuse more probably than not affected the verdict.

## C. *The Role of Expert Testimony in a Churning Case*

Here, plaintiffs had to establish that (1) trading was excessive in light of their investment objectives, (2) Ponitz controlled the accounts, and (3) Ponitz acted with intent to defraud the Shads or with reckless disregard of their interests. *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767, 773 (9th Cir.1984); *Mihara v. Dean Witter & Co., Inc.*, 619 F.2d 814, 821 (9th Cir.1980); *Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 324 (5th Cir.1981); Hyman, *Churning in Securities: Full Compensation for the Investor*, 9 U.Dayton L.Rev. 1 (1983).

The question of whether exclusion of expert opinion that churning or its several elements are present is an abuse of discretion is one of first impression. This circuit

has condoned admission of testimony that accounts were churned. *Hatrock* at 775; *Mihara* at 819. The wisdom of introducing expert testimony regarding indications of churning is unquestioned. In several churning actions, JNOV was granted for defendants because plaintiffs neglected to introduce expert testimony. *Landry v. Hemphill, Noyes & Co.*, 473 F.2d 365, 374 (1st Cir.), *cert. denied*, 414 U.S. 1002, 94 S.Ct. 356, 38 L.Ed.2d 237 (1973); *Booth v. Peavey Company Commodity Services*, 430 F.2d 132, 135 (8th Cir.1970).

### D. *Prejudicial Exclusion of Evidence*

■ Based upon the foregoing evidentiary principles, and upon the elements of churning which plaintiffs must establish, introduction of expert opinion on churning is essential. The court excluded the Shads' expert testimony for two reasons. First, the court found that considerations of waste of time substantially outweighed its probative value, under Fed.R.Evid. 403. Second, the court found that the jury could understand the issues without the assistance of experts, under Fed.R.Evid. 702.

The court balanced the interests of probity and waste of time. The court repeatedly expressed its belief that eleven days were required for trial only because plaintiffs wanted to present unnecessary evidence, and that without this obstruction the matter could be tried in four days. Hence, the delay we are concerned with is a maximum of seven trial days. Balanced against this delay is the fact that, because of the complexity of the concepts involved, the Shads were unable to present their case adequately to the jury.

Under Fed.R.Evid. 702, this testimony is essential to assist the jury. Churning is a unified offense which is identified only by an analysis of the entire history of a broker's management of an account. *See Miley v. Oppenheimer & Co., Inc.*, 637 F.2d 318, 327 (5th Cir.1981).

Churning consists of the conjunction of three complex factors. The first is excessive trading in view of investment objectives. Excessive trading is analyzed by examining risk, comparative suitability, and trading patterns. Suitability is apparent only by comparison with other possible investments. To determine whether the investments are suitable, one must know the spectrum of possible investments to which the ones in issue are compared. The significance of statistical measurements of account activity, such as the turnover rate, is apparent only in comparison to activity in other accounts. If an expert is not allowed to testify that given statistics evidence excessive trading, the jury is left with meaningless numbers from which they cannot judge the appropriateness of the transactions.

The second element of churning, control of the accounts, is somewhat more comprehensible to a jury for two reasons. First, it is in part based upon considerations such as the access of the client to the account executive and to the data. Second, the jury generally needs no special expertise to imagine itself in the position of a person of average experience and intelligence. However, this element is so inextricably involved with the other elements that an expert should be permitted to express an opinion to the jury.

Finally, the account executive's scienter, defined as intent to defraud or reckless disregard, must be established. Scienter usually will not be established by direct evidence, but rather will be inferred from a finding of excessive trading and control. The reasons for allowing expert testimony regarding control and excess trading are equally applicable to scienter.

Moreover, because there was conflicting evidence concerning all three issues, exclusion of this evidence was not harmless error. Exclusion prevented the Shads from presenting their case to a jury and mandates a new trial.

### III

### MISTRIAL

The Shads contend that the district court abused its discretion in denying their motion for mistrial based upon judicial misconduct. Here, the court's exercise of control over the proceedings pursuant to Fed.R. Evid. 611(a) included questioning the wit-

nesses, exclusion of evidence, and admonitions to counsel.

Denial of a mistrial motion is reviewed for abuse of discretion. *United States v. Crisco*, 725 F.2d 1228, 1233 (9th Cir.), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984).

Litigants are entitled to a trial before a judge who is detached, fair and impartial. *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir.1980). A trial court commits reversible error when it expresses its opinion on an ultimate issue of fact in front of the jury or it argues for one of the parties. *Handgards, Inc. v. Ethicon, Inc.*, 743 F.2d 1282, 1289 (9th Cir.1984), *cert. denied*, 469 U.S. 1190, 105 S.Ct. 963, 83 L.Ed.2d 968 (1985); *see Maheu v. Hughes Tool Co.*, 569 F.2d 459, 471–72 (9th Cir. 1978). In order to aid the jury in reaching a just conclusion, it is within the trial court's discretion to call attention to evidence it believes important. *Maheu*, 569 F.2d at 471. Questions by a court indicating skepticism are not improper when the witnesses are permitted to respond "to the district court's expressed concerns to the test of their ability". *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1383 (9th Cir. 1984). A trial court will be reversed for excessive judicial intervention only if the record "disclose[s] actual bias on the part of the trial judge [or] leave[s] the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality". *Warner v. Transamerica Insurance Co.*, 739 F.2d 1347, 1351 (8th Cir.1984). Comments by the court which reflect unfavorably on counsel's conduct at trial are not prejudicial unless of a serious nature. *Sleek v. J.C. Penney Co.*, 324 F.2d 467, 477 (3d Cir. 1963). Generally, isolated comments that relate to counsel's skill rather than good faith or integrity are not prejudicial. *See United States v. Singer*, 710 F.2d 431 (8th Cir.1983). Thus, in *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1271 (9th Cir.1980), although the court demeaned the quality and relevance of counsel's evidence, suggested non-discriminatory explanations for defendant's actions, and disparaged the

wisdom of Congress in enacting Title VII, it was not reversible error. The defendants had a strong defense, the court did not address the ultimate issues, and the court properly instructed the jury not to take its remarks as evidence. In *Murphy v. City of Flagler Beach*, 761 F.2d 622, 627 (11th Cir.1985), the court's heated rebuke to counsel was not reversible error because it was an isolated incident.

██ Here, many of the court's questions clarified either counsel's question or the response of the witness. The evidence was complex, involving hundreds of transactions in four accounts over four years. The court was alert to ways to condense the examination of witnesses and clarify complex testimony. Witnesses were given adequate opportunity to respond to the court's questions. Criticism of counsel's trial preparedness did not impugn his integrity or the merit of his cause. The court did not state its opinion on whether the accounts were churned and did not become an advocate for either side. Comments by the court served to control the introduction of evidence and pace of the trial, as is the court's duty under Fed.R.Evid. 611(a). The court did not delegate its duty to rule on the mistrial motion. Viewed in the context of the entire trial, the court's conduct was proper and the court did not abuse its discretion in denying the Shads' mistrial motion.

## IV

### INSTRUCTIONS

██ Plaintiffs maintain the court erred in failing to instruct the jury on the contents of NYSE Rule 405 and NASD Rules, Art. III, Sec. 2, of which it had taken judicial notice, and the *Hatrock* instruction, that an award need only be a fair approximation of damages. *Hatrock v. Edward D. Jones & Co.*, 750 F.2d 767 (9th Cir.1984). Plaintiffs failed to object to omission of the NYSE and NASD rule instructions before the jury retired and may not raise their objection for the first time on appeal. Fed. R.Civ.P. 51. We review omission of the *Hatrock* instruction in the light of the instructions as a whole, and ask whether the

court gave adequate instructions on each element of the case to ensure that the jury fully understood the issues. *Fiorito Bros. v. Fruehauf Corp.*, 747 F.2d 1309, 1316 (9th Cir.1984). The instructions must give the jury adequate guidance to intelligently determine the questions presented. If instructions are adequate, refusal to amplify them is not grounds for reversal. *Wellman v. Jellison*, 593 F.2d 876, 878 (9th Cir.1979).

The jury was instructed that "the customer may recover as damages such commissions and margin interest which the broker receives as a result of churning" and had before it stipulated figures for the total purchases, commissions and interest. The jury could have calculated damages from this evidence. Refusal to give the *Hatrock* instruction was not an abuse of discretion.

## V

### CONCLUSION

The district court is REVERSED and this matter is REMANDED for proceedings not inconsistent with this opinion.