In re THOMSON McKINNON SECURITIES, INC., Thomson McKinnon Inc. and Realty International Corporation, Irene Robbins and Bert Shepherd, Trustees of the Davis Robbins Family Trust and the Davis Robbins Marital Trust, Debtors.

Bankruptcy Nos. 90 B 10914 (JJC), 90 B 11805 (JJC) and 90 B 13820 (JJC).

United States Bankruptcy Court, S.D. New York.

Jan. 31, 1996.

Donald G. McCabe, New York City, for Thomson McKinnon Securities, Inc.

Robert B. Eubank, Birmingham, AL, for claimants Irene Robbins and Bert Shepherd.

Norma Ortiz, Office of the United States Trustee, New York City.

## DECISION ON ESTIMATION OF CLAIMS

JOHN J. CONNELLY, Bankruptcy Judge.

Irene Robbins and Bert Shepherd ("Trustees" or "claimants") filed proofs of claims against Thomson McKinnon Securities, Inc. ("TMSI"), alleging churning of two separate brokerage accounts. Trustees base their claims on Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and Section 19(a) of the Alabama Securities Act, Code of Alabama § 8–6–19(a). TMSI was an investment and securities broker prior to the filing of their liquidating Chapter 11 cases with this court on March 28th, 1990. TMSI filed a timely objection to Trustees' claims on November 20, 1992. By order dated February 11, 1991, the late Honorable Howard Schwartzberg, directed that the claims be liquidated pursuant to 11 U.S.C. § 502(c) of the Bankruptcy Code.

### I. Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(a) and 1334, and in particular 11 U.S.C. § 502(c)(1), which requires the estimation of unliquidated claims, the liquidation of which would delay the administration of a bankruptcy case. Venue is proper under 28 U.S.C. § 1409(a). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B).

### II. Background

Trustees' claims arise from two trusts established under the will of Davis Robbins, a family trust and a marital trust (individually, "Family Trust" and "Marital Trust," or collectively, "Trusts"). The Trusts were the source of funds for two accounts (individually, "Family Trust Account" and "Marital Trust Account" or collectively, "Robbins Trust Accounts" and "Accounts") opened in the Birmingham office of TMSI. Broadly stated, the Trustees are unsatisfied with TMSI's management of the Accounts during the period January 1, 1985 through October 31, 1987. Although the Trustees do not quarrel with the suitability of the securities purchased, they allege that the trading frequency was excessive in light of the Trusts investment objectives. In short, the Trustees allege that John Day, the broker primarily responsible for the Accounts, "churned" the Accounts by purchasing securities for the Accounts with the sole purpose of creating commissions. The Trustees seek redress for violations of federal and state securities laws.

█ Amidst this factual backdrop, this Court is charged with liquidating Trustees' claims against TMSI, the lodestar being the efficient and quick resolution of these bankruptcy proceedings. *See Bittner v. Borne Chemical Co.*, 691 F.2d 134, 137 (3d Cir.1982) *citing* 124 Cong.Rec. H 11101–H 11102 (daily ed. Sept. 28, 1978). The Bankruptcy Code provides for the estimation of contingent or unliquidated claims, "the fixing or liquidation of which, as the case may be, would unduly delay the administration of the case ..." 11 U.S.C. § 502(c)(1). The Code and the Federal Rules of Bankruptcy are silent as to an applicable procedures governing the estimation hearing. In filling the void, courts have determined that judges are to use "... whatever method is best suited to the circumstances." *Addison v. Langston (In re Brints Cotton Marketing, Inc.)*, 737 F.2d 1338, 1341 (5th Cir.1984); *In re Thomson McKinnon Securities, Inc.*, 143 B.R. 612, 619 (Bankr. S.D.N.Y.1992); *In re Windsor Plumbing Supply Co., Inc.*, 170 B.R. 503, 520 (Bankr. E.D.N.Y.1994). A bankruptcy judge "... is bound by the legal rules which may govern the ultimate value of the claim. However, there are no other limitations on the court's authority to evaluate the claim save those general principles which should inform all decisions made pursuant to the Code." *Bittner*, 691 F.2d at 135–36.

The manner chosen for the claim at bar was an estimation hearing. Each side was entitled to the presentation of one witness and the introduction of one deposition. This opportunity was seized by both the Trustees and TMSI. Each side introduced an expert witness as well as placing into the record relevant portions of earlier depositions. Fur-

thermore, this court has been supplied with extensive memoranda and affidavits by the parties upon which a reasonable estimation may be based.

## III. Findings of Fact

1. Davis Robbins, Sr. invented a coal mining device, the sale of which yielded him several million dollars of stock in the purchasing company, Joy Manufacturing Company. Upon his death in 1976, the two trusts, one of which benefitted his wife, the other benefitting his adult children were funded, primarily with the Joy Manufacturing Company stock, and several thousand acres of land. (Shepherd at 27–5).[1] All of the active participants under the trust, including Davis Robbins, Sr., the beneficiaries of both trusts, and the Trustees, reside in Oneonta, Alabama, a small town roughly 45 miles northeast of Birmingham, Alabama.

2. By 1983 the Trustees had fully liquidated the stock contained in the trusts. The Trustees then opened two Accounts at TMSI's Birmingham office. In funding the Accounts, the Trustees transferred over $4,000,000 in cash and securities.[2] TMSI's role in the Accounts terminated in late October, 1987, when the Trustees elected to transfer the Accounts with Day to his new employer Paine Webber, Inc. ("Paine Webber"), another brokerage firm.

3. Trustee Bert Shepherd was 69 years old when the Accounts were opened in 1983. Possessing a high school education supplemented by correspondence school classes in accounting, Shepherd spent many years as an accountant at various companies. (Shepherd at 9–19). His acquaintance with the elder Robbins stemmed from his employment with one of the companies owned by Robbins.

4. Trustee Irene Robbins was also 69 years old when the Account with TMSI were first opened. She possessed a grammar school education and had no financial training. She played no role in the oversight of the Robbins Trust Accounts. (Shepherd at 45–9).

5. The Accounts at TMSI were opened in early 1983, and at that time were the primary responsibility of John Strauss, a broker employed by TMSI. In 1984 John Day, then roughly 23 years old and the son of branch manager Roland Day, began assisting Strauss with the Robbins Trust Accounts. Initially, Day received twenty percent of the gross commissions earned by Strauss from the Accounts. (Strauss at 25–2). However, from approximately the end of 1985 through the end of October, 1987, Day received fifty percent of the gross commissions earned by Strauss. (Strauss at 63–19).

6. When the Accounts were opened, the Trustees communicated to Strauss that the Accounts represented the chief source of income to the beneficiaries of the Trusts. Five families, including an office staff, relied upon the income from the Trusts for their livelihood. (Strauss at 14–7). Accordingly, the Trustees selected growth and income as the Trusts' investment objectives on the new account forms. (Strauss at 16–13). The Trustees declined to check boxes labelled "speculation" and "trading" since that was inconsistent with the Trusts more conservative investment goals. (Strauss at 18–5 and Trial Exhibits C–1 and C–2).

7. The Accounts were opened at TMSI as "non-discretionary." In order to enter trades, the placing broker was required to seek approval from the Trustees prior to the actual placement of the order. (Strauss at 26–14).

8. During the relevant period, TMSI complied with federal securities law[3] by mailing confirmation slips. These slips indicated the trade date and settlement date of

---

1. Citations to Shepherd or Strauss at _____, is a reference to the deposition transcript of the respective party. References to the trial transcripts or exhibits will be cited in the same manner.

2. Two separate accounts were maintained at TMSI, one for the Marital Trust and one for the Family Trust.

3. S.E.C. regulations provide: "It shall be unlawful for any broker or dealer to effect for or with an account of a customer any transaction in … any security … unless such broker or dealer, at or before completion of such transaction, gives or sends to such customer written notification …" S.E.C.Regs. 17 CFR § 240.10b–10(a).

each transaction, the number of shares, the price of the shares and the commission earned by the trade. Upon receipt of a confirmation, Shepherd would routinely enter the information contained therein in a private ledger. When he received monthly account statements on the Accounts, he would check them against his ledger and reconcile the accounts to the month-end statements. (Shepherd at 39–1).

9. Over time, Day's role in managing the Robbins Trust Accounts grew. Strauss was engaged in a lengthy divorce proceedings during 1985, and was only sporadically present during that time period. (Strauss at 49–8). Additionally, in early 1987, physical injuries resulted in Strauss' repeated absence from the office. (Strauss at 54–12). Accordingly, from early 1985, the management of the Robbins Trust Accounts were almost entirely in the hands of John Day.

10. By July of 1986, Day had cultivated a close personal relationship with several of the beneficiaries of the trust. (Strauss at 38–14). His temerity growing with the passage of time, Day commenced a trading pattern of buying and selling stocks without seeking the prior approval of the Trustees, despite the fact that the accounts were non-discretionary. (Shepherd at 37–15). Day however would communicate his actions to Shepherd shortly after making such trades. Shepherd apparently had no objection to this method of handling the accounts as long as the transactions produced a profit. (Shepherd at 48–3). Additionally, Shepherd believed that the beneficiaries did not care about the method used in handling the accounts as long as they received income and lived comfortably. (Shepherd at 51–11). On the several occasions that Shepherd did voice his displeasure with particular purchases, the purchases were cancelled. (Shepherd at 78–5).

11. By July of 1986, Strauss grew increasingly alarmed at the manner in which Day was managing the Robbins Trust Accounts. He communicated his concerns to Irene Robbins, Bert Shepherd, and several of the beneficiaries who agreed that steps should be taken to limit Day's trading. Strauss then drafted, and beneficiary Davis Robbins Jr. executed, the July, 1986 letter providing that all trades should be made with "... John Strauss and Bert Shepherd or a Robbins family member consulting." (Trial Exhibit C–8). In addition, the letter stated "... we want to allow up to 25% of the equity portion of the accounts to be used for trading purposes." (*Id.*). Strauss testified that this was intended to limit the amount of trades engaged in by Day who by this time was trading the entire equity portion of the account on a short term basis. (Strauss at 38–9). However, Day apparently convinced the trustee, Shepherd, that trading on a short-term basis was profitable. (Strauss at 39–15).

12. Day nevertheless continued to make trades on his own initiative. Growing increasingly dissatisfied with Day's conduct in this regard, Shepherd signed and mailed a letter to Day dated September, 1987 stating "[w]e believe that we should exercise more control over the transactions on our accounts and request that you obtain our approval prior to any purchase or sale of any stock, call or option on our accounts." (Trial Exhibit C–9).

13. In late October of 1987 Day left TMSI for Paine Webber, requesting that the Trustees move the Accounts to his new employer. Lured by Day's promise of 45% discounts on his commissions, the Trustees agreed to follow Day to Paine Webber. (Shepherd at 63–9).

14. On December 31, 1984[4] the Family Trust Account held securities and cash worth $2,000,000. On October 30, 1987 this same account was valued at $1,980,000.[5] On December 31, 1984 the Marital Trust Account held securities and cash worth $2,470,000. On October 30, 1987 this account was valued

---

4. The period at issue runs from January 1, 1985 to October 31, 1987. Accordingly, the account balances prior to December, 1984 are not relevant for these proceedings.

5. Immediately before the October, 1987 market crash the Family Trust Account had a value of $2,290,000.

at $2,740,000.[6] Thus, during the relevant time period the Accounts had a net increase in value of ten percent (a one percent decrease in the value of the Family Trust Account offset by an eleven percent increase in the value of the Marital Trust Account). (Trial Exhibit C–20). Additionally, during the time period in issue, the beneficiaries of the Accounts withdrew approximately $429,000 from the Family Trust Account and $664,000 from the Marital Trust Account. (Trial Exhibit C–18).

15. Total commissions on purchases and sales of securities were approximately $728,000 during 1985, 1986 and 1987. (Trial Transcript at 72–4).

16. In 1989, Trustees commenced an action in federal district court against Roland Day, John Day and TMSI. The court ordered that the claims, with the exception of the federal claims regarding the marital trust, be submitted to arbitration before the National Association of Securities Dealers ("NASD"). However, TMSI subsequently filed for bankruptcy protection and, consequently was withdrawn from the arbitration proceeding. The NASD ultimately awarded Trustees a $375,000 judgment against Roland and John Day. The district court confirmed the damage award, however, it refused to award interest, but found that the arbitrators had abused their discretion in not awarding attorney's fees. *Robbins v. Thomson McKinnon Securities, Inc.,* (CCH) Fed.Sec. Law Reptr. 1991 Tr. Binder ¶ 96,031, 1991 WL 138314 (6/14/91).

## IV. Discussion

### A. The Churning Inquiry

■ Much ink has been spilled on the pages of law reporters regarding the unlawful practice of churning. As long as securities brokers continue to be remunerated on a commission basis, more trees will undoubtedly be felled in an effort to delineate the doctrine's contours. Although the legal criteria governing whether a broker is found to have churned an account is thorny, the rudimentary idea is simple: "... a broker, exercising control over the volume and frequency of trading, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account." *Carras v. Burns,* 516 F.2d 251, 258 (4th Cir.1975).

■ Churning is a deceptive device within 10b and a private cause of action for damages will lie.[7] *See Superintendent of Ins. v. Bankers Life & Casualty Co.,* 404 U.S. 6, 13 & n. 9, 92 S.Ct. 165, 169 & n. 9, 30 L.Ed.2d 128 (1971); *Hecht v. Harris, Upham & Co.,* 430 F.2d 1202, 1206–07 (9th Cir.1970); *see generally Note, Churning by Securities Dealers,* 80 Harv.L.Rev. 869 (1967). It is uniformly agreed that in order to prevail on a churning claim a plaintiff must establish (1) that the broker dealer or his agent engaged in excessive trading in light of investment objectives and the character of the account; and (2) that the broker effectively exercised control over the account; and (3) that the broker acted with the requisite state of mind. *See, Newburger, Loeb & Co., Inc. v. Gross,* 563 F.2d 1057, 1069–70 (2d Cir.1977), *cert. denied,* 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); *Shad v. Dean Witter Reynolds, Inc.,* 799 F.2d 525, 529 (9th Cir. 1986); *M & B Contracting Corp. v. Dale,* 795 F.2d 531, 533 (6th Cir.1986); *Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 767 F.2d 1498, 1501 (11th Cir.1985).

6. Immediately before the October, 1987 market crash the Marital Trust Account held a value of $3,220,000.

7. Rule 10b–5 provides:
 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (a) To employ any device, scheme or artifice to defraud;
 (b) To make any untrue statement of a material fact, or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

### 1. Excessive Trading

In determining whether a broker engaged in excessive trading, the litmus test has traditionally been the "turnover ratio" or ("ATR"). This refers to the ratio of the total cost of purchases made for an account during a specified period of time to amount invested. *Franks v. Cavanaugh,* 711 F.Supp. 1186, 1191, n. 3 (S.D.N.Y.1989), *modified,* no. 88 Civ. 2121, 1989 WL 58085 (S.D.N.Y. May 24, 1989); *Frota v. Prudential–Bache Securities, Inc.,* 639 F.Supp. 1186, 1191 (S.D.N.Y.1986). However, the ATR does not, *in vacuo,* determine whether the excessive trading element has been met. Rather, the court must evaluate the volume and frequency of transactions in light of the nature of the account and the objectives of the customer. *See e.g. Van Alen v. Dominick & Dominick, Inc.,* 441 F.Supp. 389, 401 (S.D.N.Y.1976), *aff'd,* 560 F.2d 547 (2nd Cir.1977).

Since the objective measure of ATR is evaluated in tandem with the more subjective measure of the investor's investment objectives, there is no bright line test available to delineate ATRs into permissible and non-permissible camps. Although courts generally find excessive trading when there is an annual turnover rate in an account in excess of six, *Frota,* 639 F.Supp. at 1191, lower turnover ratios may still give rise to viable churning claims. *See Jenny v. Shearson, Hammill & Co.,* (CCH) Fed.Sec.Law Reptr. ¶ 96,568, 1978 WL 1115 (S.D.N.Y. Oct. 6, 1978) (refusing to hold as a matter of law that a turnover ratio of 1.84 could never constitute excessive trading). Furthermore, turnover ratios in excess of six may still be deemed proper in light of investment objectives. *See Newburger,* 563 F.2d at 1070 (finding that turnover ratio of seven times a year did not constitute excessive trading in light of the fact that the customer's investment goals included speculation). *See generally Note: Churning By Securities Dealers,* 80 Harv.L.Rev. 869 (1967).

In this case the parties disagree as to the appropriate turnover ratios of the Accounts. The claimants have based their figures on year-end equity (i.e. the total amount invested as of the end of the relevant period) whereas TMSI insist that the proper measure involves using "average net equity" as the denominator in computing ATR. The case law and views of commentators appear to support TMSI's argument. *See In re Looper & Co.,* 38 S.E.C. 294, 297 n. 6 (1958); *Siegel v. Anthony & R.L. Day, Inc.,* 658 F.Supp. 550, 554 (S.D.N.Y.1987). The Court adopts TMSI's figures as the appropriate measure of the turnover ratios in the Accounts. The figures are as follows for the relevant period:

| Year | Family Trust Account | Marital Trust Account |
|---|---|---|
| 1985 | 2.22 | 2.70 |
| 1986 | 3.04 | 3.56 |
| 1987 [8] | 4.71 | 5.15 |

Although the Court is aware that there is authority in other Circuits for determining excessive trading based upon cumulative turnover ratios, *see Marshak v. Blyth Eastman Dillon & Co., Inc.,* 413 F.Supp. 377 (N.D.Okl.1975), this Court rejects arguments to use such figures here. The facts of this case suggest that Day's trading in the Accounts increased as he gained the trust of the Robbins Trust Accounts beneficiaries and as John Strauss became occupied with other matters. In using a cumulative figure for the entire period, the increasing frequency of the trades would be lost and thus a valuable indicator obscured. Accordingly, this Court believes it would be improper to use the earlier, lower figures as a means of balancing out the higher, later figures to arrive at a single ATR measure. Such a calculation would obfuscate any attempt to discern whether it was Day's intentions to subvert over time the interests of the Robbins Trust Accounts in furtherance of his own financial gain. Claimants' case therefore must stand upon analysis aimed at the trading ratios for each successive year the Accounts were handled by TMSI.

Accordingly, it is this Court's conclusion that at a minimum the turnover ratios for each of the stated periods are sufficiently high enough to create a question of fact. The classic churning case typically involves a

---

**8.** The 1987 figures were extrapolated from an actual history of ten months.

plaintiff portraying himself as an unsophisticated investor with the conservative goal of achieving steady income and growth. Defendants, meanwhile, reflexively charge that the customer was a high roller who knew all too well the risks which attend speculative objectives in the stock market. *See Miley v. Oppenheimer & Co. Inc.*, 637 F.2d 318, 325 (5th Cir.1981), *rehearing denied*, 642 F.2d 1210 (5th Cir.1981). However, the unique factual setting of the case at bar suggests that the Trustees would be successful in establishing that they were unsophisticated investors.

Moreover, this Court's conclusion is buttressed by the fact that here claimants were not trading to benefit themselves, but rather acting as Trustees. In short, Shepherd [9] was making decisions about the Trusts that would have a direct and immediate impact on the financial livelihoods of five different families who relied upon the income generated from the portfolios managed by TMSI. TMSI was fully aware of this critical fact. (Strauss at 14–5). Thus, Shepherd's goals were not speculative or speculation or appreciation with risk.[10]

TMSI's memoranda attempt to color Shepherd as a speculative investor masterminding Day's frequent trades with an eye towards maximizing the possible return on the Accounts. In light of these objectives, TMSI conclude, the turnover ratios of the Accounts during the relevant periods were not excessive. However, the unique facts of this case belie TMSI's contention in this regard. This is not the usual churning case wherein the customer stands to gain should the broker's speculative trading result in success. Shepherd was not a beneficiary of the Trusts. It is simply incomprehensible that Shepherd would knowingly accept the risks which attend speculative objectives in the market while at the same time being precluded from partaking in the benefits of those risks had Day's purchases proved prescient.

In this context a comparison of turnover ratios experienced by mutual funds is particularly apposite. Both manage "other people's money." A recent study indicates that the mean turnover ratio for even the most aggressive mutual funds is 1.18. Winslow and Anderson, *A Model for Determining the Excessive Trading Element in Churning Claims*, 68 N.Ca.L.Rev. 327, 345 (1990). Mutual funds with more conservative goals have a mean turnover ratio of .58 [11]. In this light the Court concludes that even the smallest turnover ratio of 2.22 would suffice to create a question of fact as to whether Day churned the Accounts.[12]

## 2. Control

In order to fully understand the role that the "control" inquiry plays in the churning analysis it is necessary to review the duties a stockbroker owes his customer. With regards to non-discretionary accounts, that is, accounts in which the customer retains the legal right to control the account, a broker's duty is viewed discretely. His duties extend only to the particular trade at issue, the broker has no duty to engage in a particular course of trading. *See Hill v. Bache Halsey Stuart Shields Inc.*, 790 F.2d 817, 824 (10th Cir.1986); *Leib v. Merrill Lynch, Pierce, Fenner & Smith*, 461 F.Supp. 951 (E.D.Mich.1978), *aff'd*, 647 F.2d 165 (6th Cir.1981). In contrast, a broker of a discretionary account has the duty to manage the account in accordance with the customer's long term goals and objectives. *Leib*, 461 F.Supp. at 953. This is not to say however

---

9. Testimony reveals that Shepherd made all the decisions regarding trust management. (Shepherd at 6–14). Irene Robbins, who had considerably less formal education than Shepherd and who was far more unschooled in financial matters than Shepherd, played almost no role in the management of the Accounts.

10. Shepherd chose the box marked "income" on the new account forms, declining to check more aggressive boxes such as "speculation," "speculation or appreciation with risk," or "income with high risk." (Trial Exhibit C–1 and C–2).

11. 99.5% of all "income" oriented mutual funds would have a turnover ratio of less than 1.79. Winslow and Anderson at 349.

12. However, since a jury's conclusion as to whether Day's trading was excessive during 1985, 1986 and 1987 is inextricably bound with the damage calculus, the Court delays its conclusions with respect to this question to that portion of the opinion dealing with the estimate of potential damage awards.

that once the customer opens a non-discretionary account the broker is insulated from a charge that the account was not managed in accordance with client objectives. Rather, courts will treat a technically non-discretionary account as though it were a discretionary account upon finding that a broker has seized actual control over the management of the account. *See Cruse v. Equitable Securities of New York, Inc.*, 678 F.Supp. 1023 (S.D.N.Y.1987); *Leib*, 461 F.Supp. at 954. In such circumstances, the broker of a non-discretionary account will find himself vulnerable to the charge that the account's trading frequency was not proper in light of the client's objectives.

 In the case at bar the Robbins Trust Accounts were opened as non-discretionary accounts. In order to determine whether Day subsequently gained de facto control over these accounts this Court may rely upon several factors articulated by the courts over the years. These factors include "... the discretion given the broker dealer, the age, education, intelligence, and business and investor experience of the client, the relationship between client and broker [13], and the reliance placed by the customer on his broker." *Zaretsky v. E.F. Hutton & Co., Inc.*, 509 F.Supp. 68 (S.D.N.Y.1981). In light of these factors it is this Court's conclusion that the facts of the case at bar satisfies the control element.

Shepherd, during the relevant period, was roughly 70 years old. He spent the majority of his working life in an accounting capacity and possessed only a high school education. TMSI argue that Shepherd's career entering numbers on behalf of manufacturing concerns and one stint in the employ of an external auditor endowed him with a keen financial sense. Furthermore, TMSI maintain that the detailed logs kept by Shepherd related to the trading activity in the Accounts establishes his control over the trading decisions. I am not persuaded by TMSI's arguments that Shepherd's notetaking of transactions that occurred in the Accounts rises to the level of financial savvy. It

is this Court's conclusion that Shepherd's expertise lay in the more ministerial tasks of number crunching and not in the rarified world of high stakes trading. Moreover, Shepherd testified that from the inception of the Accounts at TMSI, "... they [Strauss or Day] were calling me to tell me what they thought we ought to buy and get my okay on it." (Shepherd at 37–4). This further buttresses the Court's belief that Shepherd did not exercise control over the Accounts.

Additionally, this Court notes the personal involvement Day had with the Robbins family. As Strauss testified, Day's relationship with the Robbins beneficiaries was not an arm's length business relationship. It is reasonable to conclude that the atmosphere of confidence and trust created by Day was such that Shepherd might reasonably feel assured in relinquishing control to the young trader. *See Kravitz v. Pressman, Frohlich & Frost, Inc.*, 447 F.Supp. 203, 211 (D.Mass. 1978); *Hecht*, 430 F.2d at 1209. Lastly, and perhaps most importantly, the Court finds it of critical importance that many of the transactions were made without Shepherd's prior approval. *See* Stuart C. Goldberg, *Fraudulent Broker–Dealer Practices*, p 73 ("The arrogance of a registered representative making unauthorized purchases or sales for a non-consenting investor, followed by the obtaining of the investor's consent after the fact, is probably the most cogent evidence of control possible"). As Shepherd's testimony indicated, Day purchased and sold securities without consulting him on a regular basis as time passed.

Strauss testified that he was aware that Day would engage in a number of trades without Shepherd's prior approval. This practice provoked Strauss to draft a letter, signed by a Robbins Trust beneficiary, imploring Day to obtain approval before engaging in transactions on behalf of the Accounts. (Trial Exhibit C–8). When this letter proved to no avail, Shepherd was prompted to write another letter in which he stated his desire to retain more control over the Accounts. (Trial Exhibit C–9). In conclusion, Day's utter

---

13. A third party is suggested here, the beneficiaries. The record reveals that Day entertained a personal relationship with the beneficiaries.

refusal to seek consensus from the Trustees on the management of the Accounts, Shepherd's lack of sophistication with business matters and the close relationship between Day and the Robbins family mandates a finding that Day exercised actual control sufficient to meet the second requirement of the churning inquiry.

### 3. Intent

▮▮▮ The successful plaintiff in an action based upon § 10(b) and rule 10b–5 promulgated thereunder of the Exchange Act must establish that the broker acted with scienter. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Scienter in the churning context requires proof of fraudulent intent or a willful or reckless disregard for the interests of the claimants. *Franks*, 711 F.Supp. at 1186; *Moran v. Kidder Peabody & Co.*, 609 F.Supp. 661 (S.D.N.Y.1985), *aff'd*, 788 F.2d 3 (2d Cir.1986). Although Trustees maintain that proof of state of mind is not a requirement under Alabama's securities law, this Court need not reach that contention because scienter has been adequately established by the case at bar. As stated by the Second Circuit in *Armstrong v. McAlpin*, "[c]hurning, in and of itself, may be a deceptive and manipulative device under section 10(b), the scienter required by section 10(b) being implicit in the nature of the conduct." 699 F.2d 79, 91 (1983); *accord Shad v. Dean Witter Reynolds, Inc.*, 799 F.2d 525, 530 (9th Cir. 1986); *Hecht*, 430 F.2d at 1209.

Since the Court has concluded that a reasonable jury could find that there was excessive trading and that Day was in control of the Accounts during the relevant time period in issue, this Court has little difficulty in finding that Day possessed the requisite state of mind to satisfy the scienter requirement of the Exchange Act.[14] TMSI make no argument that Day's trading levels were derived from a good faith belief in the efficacy of a particular trading system. Rather, con-

fronted with a broker whose trading dramatically increased in direct proportion to his growing autonomy, TMSI merely point to the fact that Day maintained sizable cash reserves in the Accounts and did not use options. Such an argument is unconvincing and specious, at best.

### B. The Calculation of Damages

At one time, damage calculations in churning cases did not invite much debate. The authorities were generally in agreement that a restitutionary remedy was in order. As such, the churning broker would normally be expected to disgorge his gains in the form of commissions received during the relevant time period. *See Zaretsky*, 509 F.Supp. at 73; *Hecht*, 430 F.2d at 1211; *see generally* Tracy A. Miner, Note, *Measuring Damages in Suitability and Churning Actions Under Rule 10b–5*, 25 B.C.L.Rev. 839 (1984). The days of such simple certitude are long gone. One who longs for uniformity of opinion will be frustrated by the absence of a single standard governing the award of damages in the churning context. *See Sebbag v. Shearson Lehman Brothers*, (CCH) Fed.Sec. L.Reptr. ¶ 95,775 at 98,727, 1991 WL 12431 (S.D.N.Y.1991) (noting lack of a uniform federal rule governing the appropriate damages to be awarded in a churning case).

▮▮ Despite this general uncertainty it is well established that when the relevant trading did not result in an overall decline in the size of the two accounts, this does not itself serve as a bar to recovery. *See Davis v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 906 F.2d 1206, 1218 (8th Cir.1990); *Nesbit v. McNeil*, 896 F.2d 380, 386 (9th Cir.1990); *Miley*, 637 F.2d at 327. As noted by the Eighth Circuit in *Davis* a contrary result would allow securities brokers to "... churn their customers accounts with impunity so long as the net value of the account did not fall below the amount originally invested."

---

**14.** As further evidence of Day's fraudulent intent with regards to the Robbins Trust Accounts, Trustees sought to submit proof that Day, immediately after leaving TMSI, perpetrated a fraud on Trustees' Accounts. As a consequence of this subsequent fraud Day was fined and barred from the industry. TMSI maintain that such evidence is both irrelevant as well as inadmissible under the Federal Rules of Evidence as an impermissible use of character evidence to prove conduct in conformity therewith: The Court need not decide this evidentiary issue since the Court finds that the scienter requirement is met by the facts at bar.

906 F.2d at 1218. Thus, the $270,000 gain[15] experienced by the Robbins Trust Accounts does not preclude recovery in this case.

### 1. Commissions versus "economic loss"

■ Trustees' reading of the law regarding damages in churning cases favor those opinions which employ an economic loss approach to remedying broker violations of their customer's trust. The essence of this approach, is to award the difference between the general rise in the bull market of the mid 1980s (as measured by an "appropriate" index[16]) and the actual increase in the value of trustees' portfolio. Trustees concede that during the relevant period the Accounts combined yielded positive gains, experiencing only a nominal decline in the equity balance of the Family Trust Account. This was essentially offset by a larger increase in the equity balance of the Marital Trust Account. Nevertheless, the Trustees maintain that they deserve recompense equal to the amount they would have received had they possessed the prescience to park their funds in the thirty securities that comprise the Dow Jones Industrial Average. As support for their proposition that they are entitled to an economic loss award, the Trustees cite to a second circuit opinion, *Rolf v. Blyth Eastman Dillon & Co., Inc.,* 570 F.2d 38 (2d Cir.1978), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978), *aff'd in part and remanded,* 637 F.2d 77 (2d Cir.1980), as well as a fifth circuit opinion, *Miley,* 637 F.2d at 318. However, even the most charitable reading of these cases do not lend credence to the Trustees' claim that Day's conduct warrants an economic loss award. Accordingly, this Court finds that the ceiling on possible damage awards is set by the amount of commissions.

While it is true that *Rolf* is a seminal decision on the use of market indices in calculating damages under Rule 10b–5, Trustees' reliance upon this decision is misplaced. *Rolf* involved a claim that defendant's broker purchased unsuitable securities the poor performance of which rapidly destroyed the value of the portfolio, and that the broker's supervisor recklessly reported to the customer that his account was faring well when the opposite was true. The Second Circuit concluded that the plaintiff was entitled to the decline in the value of his portfolio excluding that portion of the loss which would have been attributable to the general decline in the market during the relevant period, as measured by a standard market index. *Rolf* at 48–49. Accordingly, damages in *Rolf* were not in response to the broker's excessive trading. Moreover, the market index was used as a means of capping the award, and not as a method of augmenting it. In fact, the opinion itself strengthens TMSI's position that restitution remains the preferred remedy when no argument is raised as to the unsuitability of securities purchased for the nature of the accounts and the client's objectives. The *Rolf* court stated that given the dramatic decline in plaintiff's portfolio, a damage award premised on this decline was not so speculative "... as to compel resort solely to damages as in a churning case, for commissions paid the broker (and interest thereon)." *Id.* at 48.

In *Miley* the Fifth Circuit was presented with the opportunity to add to the growing chorus of opinions on the subject of damages in churning cases. There the court upheld the district court's decision to allow the plaintiff to recover the commission and interest paid as a result of the excessive trading. Further, the court embraced the Second Circuit's decision in *Rolf,* and held that the plaintiff was entitled to portfolio decline. As in *Rolf,* the general market index was used to set a cap on the damages on account of the overall decline in the market during the relevant period. In justifying its allowance of both excess commissions as well as portfolio decline the court stated:

> [w]hile excessive commissions represent the sole source of gain to the broker from

---

**15.** As of October 30, 1987 the value of the Family Trust Account declined in value by $20,000 from its value of $2,000,000 on December 31, 1984. The Marital Trust Account, on the other hand, increased in value in an amount equal to $270,000.

**16.** The Trustees urge adoption of the Dow Jones Industrial Average, a rise of approximately 65%.

his misconduct, there are in fact two distinct harms which may be proximately caused by the broker's churning of an account. It is necessary to remedy both harms in order to fully compensate the victimized investor ... First, and perhaps foremost, the investor is harmed by having had to pay the excessive commissions to the broker ... Second, the investor is harmed by the decline in the value of his portfolio ... as a result of the broker's having intentionally and deceptively concluded transactions, aimed at generating fees, which were *unsuitable* for the investor. (Emphasis added).

*Miley*, 637 F.2d at 326.

As the above quoted passage indicates, the *Miley* court also recognized the distinction between churning and unsuitability claims. It is only in the latter circumstance, or, more commonly, in both circumstances combined, that courts should recompense the plaintiff for sluggish or negative portfolio growth. *In Re Drexel Burnham Lambert Group, Inc.,* 161 B.R. 902, 909 (S.D.N.Y.1993) (noting that the proper basis for damages for churning is amount of commissions, fees, interest and taxes and that proper basis for unsuitability claims is the "gross economic loss of plaintiff, with an adjustment for the overall market's performance"). The Trustees have not alleged unsuitability of purchases during the relevant period. Accordingly, *Rolf* style damages are not warranted in the case at bar.

2. Ratification

▬▬▬▬ Additionally, even if the Court were to conclude that Day's investment strategy warranted imposition of *Rolf* style damages, this Court would decline the opportunity to apply a market shortfall remedy based upon Shepherd's ratification of Day's investment decisions. Ratification occurs when it is clear from all the circumstances, including failure to object within a reasonable time, that the customer intends to adopt a trade as his own. *See Jaksich v. Thomson McKinnon Securities, Inc.,* 582 F.Supp. 485, 496–97 (S.D.N.Y.1984); *see generally,* S. Goldberg, 2 Fraudulent Broker–Dealer Practices 11–39 (1978). Thus, even if a particular trade is

unauthorized when made, the customer will be bound if he manifests his assent to the broker's actions. The customer's assent must be given voluntarily and intelligently with full knowledge of the facts. *Karlen v. Ray E. Friedman & Co. Commodities,* 688 F.2d 1193, 1198 (8th Cir.1982).

This Court concludes that Shepherd's knowledge of brokerage accounts, though not rising to the degree of sophistication claimed by TMSI, was sufficient to put him on actual notice of the overall performance of the Accounts. Shepherd received confirmations for every trade entered. As Shepherd stated in his deposition, he transferred the information from the confirmations and placed various entries into his private ledger. Shepherd reconciled the monthly TMSI statements with his detailed ledger. The ledger contained information on purchases and sales of securities, dividend income, profit from the sale of securities along with the available cash balances in both Accounts. Additionally, he provided monthly reports to the beneficiaries of the Trusts. Accordingly, Shepherd was fully aware of the value of the Accounts at all times. Additionally, Day did contact Shepherd, albeit after the fact, to advise him on securities that were either purchased or sold in the Accounts. Shepherd did not object to this method. When Shepherd raised an objection to a specific trade, Day cancelled the trade in question.

Accordingly, the confirmation slips and monthly statements, coupled with Shepherd's contact with Day over the relevant period, along with Shepherd's failure to object to Day's method of trading without seeking prior authorization from him and Shepherd's lifelong employ in a business milieu, were sufficient to put him on actual notice that the Accounts were not growing as rapidly as general market indices. Shepherd's failure to object to the general performance of the Accounts bars the Trustees from maintaining that they are now entitled to the difference between the actual growth experienced by the Accounts and the amount of growth of the market as a whole. Rather, Shepherd's knowledge of the brokerage industry was sufficient to charge him with the ordinary risks of profit and loss. *See Hecht,* 430 F.2d

at 1209; *see also Altschul v. Paine, Webber, Jackson & Curtis,* 518 F.Supp. 591, 594 (S.D.N.Y.1981); *Van Alen,* 441 F.Supp. at 401.

■■■■ As in most churning cases, TMSI advance the defense that the Trustees ratified the amount of trading in the Accounts thereby inoculating TMSI from a finding of broker churning. The Court disagrees. A finding that Shepherd ratified Day's purchases for purposes of determining whether economic loss damages are appropriate is not the same as a finding that Shepherd ratified Day's excessive trading. By its very nature, churning is not readily detectible by the customer. Accordingly, ratification arguments in the churning context bear a heavy burden. *Davis,* 906 F.2d at 1213.

Although the Court finds that Shepherd possessed sufficient competence to evaluate the Account's performance in an overall sense, the Court does not find that his sophistication imparted an understanding of whether the frequency and volume of transactions were excessive. As this Court noted earlier, the Accounts sustained five families and a staff of two. As such, Shepherd wanted to generate profits from the accounts to distribute to family members. Strauss' deposition is telling as to Shepherd's desires, Strauss stated that "... [Day] had convinced Bert [Shepherd] that trading on a short-term basis was a very profitable venture. Bert would see that you buy a stock at fifty, if you sell it at fifty-one, you make three thousand dollars [and] five thousand shares, that is obviously a profit. Whether it is worth the risk or not was a judgment call." (Strauss at 39–15). Shepherd apparently became aware of one method for generating income, that is to realize the gains from stock purchases by selling the securities. While holding a particular stock will provide you with dividend income, until that stock is sold, a gain or loss is not realized. Dividend income alone may not have been sufficient to generate the income necessary to sustain five families. However, this knowledge by Shepherd does not imply that he ratified the frequency and volume of transactions. For instance, Strauss stated that it was not unusual for Day to enter forty plus trades a day for all the Robbins Accounts. (Strauss at 44–1). At this juncture, this Court is unconvinced that Shepherd fully understood the significance of forty plus trades per day on all the Robbins Accounts. It is important to note that Shepherd's duties as Trustee extended only to the Accounts he established with TMSI. This was Shepherd's first foray into the financial markets. As such, Shepherd had no other basis to compare the trading volume of the Accounts. Moreover, being a relative notice to the world of portfolio management and the financial markets, Shepherd cannot be charged with a knowledge of the optimum trading levels of equity accounts. *See Hecht v. Harris, Upham & Co.,* 283 F.Supp. 417 (N.D.Cal.1986), *judgment modified,* 430 F.2d 1202, 1209 (9th Cir.1970) (customer ratified suitability of purchases but did not possess the requisite sophistication to relieve broker of liability stemming from excessive trading).

Finally, this Court is concerned with brokers who use their superior knowledge of the financial markets to enhance their wealth at the expense of their customers. As a matter of public policy, this type of behavior should be discouraged. Particularly, when as here, the customer has little or no experience in the financial markets and relied on the broker to provide the insights therein. A finding of churning and the imposition of damages on either the broker or the broker dealer acts as a deterrent to this type of behavior. Others will not likely follow suit when any ill gotten gains must be disgorged.

## V. The Estimate

■■■■ In picking among the myriad options available to the estimating court for liquidating a claim under 11 U.S.C. § 502(c), the bankruptcy court has wide discretion. *In re Windsor Plumbing Supply Co. Inc.,* 170 B.R. 503 (Bankr.E.D.N.Y.1994). The court need not don the garb of the clairvoyant; rather, all that is required is a "rough estimate." *In re Chateaugay Corp.,* 944 F.2d 997, 1006 (2d Cir.1991); *In re Baldwin–United Corp.,* 55 B.R. 885, 898 (Bankr.S.D.Ohio 1985); *see In re Nova Real Estate Inv. Trust,* 23 B.R. 62, 66 (Bankr.E.D.Va.1982). Some courts have proceeded on an "all or

nothing" basis, awarding the full value of the claim if the claimant proves his case by a preponderance and awarding a zero value if the claimant fails to prove his claim. This has been held to not be an abuse of discretion. *See Bittner,* 691 F.2d at 136 (affirming bankruptcy court's valuation of claim at zero). However, the Court finds the *Bittner* approach to be inappropriate for the case at bar. Instead, the Court opts for an approach which anticipates possible jury awards. This Court finds the language in *Windsor Plumbing Supply* most persuasive:

> An estimator of claims must take into account the likelihood that each party's version might or might not be accepted by a trier of fact. The estimated value of a claim is then the amount of the claim diminished by probability that it may be sustainable only in part or not at all ... Recognizing that the magnitude of recovery is to a large extent dependent upon the individual backgrounds of the triers of the facts, what we are given to deal with is a range of possible awards which we must first turn into a range of probable awards running from zero to the full amount of the claim. An *expected value* can then be found by multiplying a number of possible recovery values by the probability of their occurrence and taking the sum of these products.

170 B.R. at 521; *accord In re Farley, Inc.,* 146 B.R. 748, 753–54 (Bankr.N.D.Ill.1992).

This Court rejects the Trustees' claim for an economic loss award of $2,700,000. Rather, the appropriate measure of damages in the case at bar is commissions received. Accordingly, the ceiling on a possible award is the $728,000, the amount of commissions stipulated to by the parties in the Record. The range outlined in the amount of possible award category below is based on the likelihood that a trier of fact may look to a variety of scenarios to find an appropriate award. For instance, one variation may well be the District Court of Alabama's confirmation of the arbitration award, including attorney's fees for a total of $505,000. A second possible variation on the amount is the confirmed arbitration award of $375,000, excluding attorney's fees. That is the amount that TMSI

alleges should be the ceiling on any possible award granted to the claimants. A third possible range is the amount of commissions earned by Day, roughly $210,000 for 1985, $210,000 for 1986 and 310,000 for 1987. A final variation may be that a trier of fact would not opt to award any damages. TMSI urges this approach. Based on the range of possible award set out below, and the probability of each occurrence, an expected value of $214,500 is found.

| Amount of Possible Award | Probability | Expected Value |
|---|---|---|
| $728,000 | 0 | 0 |
| $505,000 | 0 | 0 |
| $375,000 | 0.1 | $37,500 |
| $310,000 | 0.3 | $93,000 |
| $210,000 | 0.4 | $84,000 |
| 0 | 0.2 | 0 |

Total Expected Value $214,500

## VI. Conclusion

This Court finds and concludes that, based on the Record, the claimants have sufficiently met the burden for establishing the necessary requirements for churning. In addition, the Court finds that pursuant to § 20(a) of the Exchange Act, TMSI is liable for damages resulting from broker John Day's churning. The Court further concludes that the facts of the instant case do not warrant an economic loss award, particularly in light of the finding that the Trustee ratified John Day's investment decisions. The appropriate measure of damages for the case at bar is commissions, attorneys fees and costs.

Accordingly, pursuant to the directions of the late Honorable Judge Schwartzberg, this Court estimates the Trustees' claims to be $214,500 along with reasonable attorneys fees and costs.