In re Steven HANNA, Debtor.

Joan ARNDT, Plaintiff,

v.

Steven HANNA, Defendant.

Bankruptcy No. 191–18284–260.
Adv. No. 192–1204–260.

United States Bankruptcy Court,
E.D. New York.

June 25, 1996.

U.S.C. § 362(d). Appellant's arguments fall under subsection (1).

Victor Mevorah, P.C. by Patricia A. Deegan, Garden City, New York, for Plaintiff.

Crupain & Greenfield by Daniel Crupain, New York City, for Debtor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONRAD B. DUBERSTEIN, Chief Judge.

Joan Arndt ("Plaintiff"), a creditor of Steven Hanna ("Debtor" or "Defendant" or "Hanna"), a Chapter 7 debtor, initiated this adversary proceeding seeking a determination that an arbitration award ("Award") rendered in her favor against him in the amount of $85,540.25 and confirmed by the Supreme Court of the State of New York, is nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code ("Code").[1]

At the outset of this adversary proceeding, the Plaintiff moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), which is made applicable to bankruptcy proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr. P."). The Plaintiff claimed that the Award was predicated on the Debtor's violations of section 10(b) of the Securities Exchange Act of 1934 (the "Act") and constituted common law fraud, and thus, under the doctrine of res judicata, was nondischargeable pursuant to section 523(a)(2) of the Code. Alternatively, the Plaintiff maintained that under the doctrine of collateral estoppel, the Debtor should be barred from relitigating the issues of fraud and damages.

In opposition to the Plaintiff's motion, the Debtor pointed to the Award and contended that there was no factual or legal basis for this Court to find as a matter of law that the issue of fraud was necessary to the arbitrator's decision because although presented

---

1. Unless otherwise indicated, subsequent chapter, section and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* and to the Federal Rules of Bankruptcy Procedure, Rules 1001 *et seq.*

with multiple causes of action, the Award itself was devoid of any factual findings and thus could have been based on any one or more theories of liability as set forth in the complaint submitted to arbitration. The Plaintiff's motion for summary judgment was denied by this Court and the issues were set down for trial. *See* the opinion of this Court cited at 163 B.R. 918 (Bankr.E.D.N.Y.1994).

This matter having come on for trial, and after consideration of the arguments of counsel, the evidence presented, briefs and other documents submitted after the trial, this Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52 made applicable to this proceeding by Rule 7052.[2] For the reasons hereinafter set forth, the Plaintiff's complaint is dismissed.

## FINDINGS OF FACT

1. In June of 1988, while the Debtor was employed with the brokerage firm of J.T. Moran & Company, Inc. ("Moran"), the Plaintiff entered into a margin agreement authorizing the Debtor to effect securities transactions on the Plaintiff's behalf and subject to her approval. This fact is undisputed even though it does not appear that any formal document was signed expressing such an agreement. The Plaintiff concedes that at the time she opened this account, she was not aware of what a margin account entailed.[3]

Each month, the Plaintiff would receive an account statement from Moran, itemizing the transactions of the previous month.[4] In addition, Plaintiff received confirmation slips of each transaction.[5]

2. At the time of the trial, the Debtor testified that he was employed as a stockbroker with the Harriman Group in Syosset, Long Island. He testified that he had been working as a broker for approximately 8 years and had been employed at several other firms including Barrett Day Securities, J.T. Moran ("Moran"), Phillip Appel & Walden ("Phillip Appel"), Swartwood Hess [6] and Monvest Securities.

3. The Plaintiff is an adjunct professor at Hofstra University. She became acquainted with the Debtor through the latter's cousin, Jim Halaby ("Halaby"), with whom the Plaintiff had originally opened an account. This account, fueled by an initial investment of approximately $8,000 to $10,000, was subsequently transferred to the Defendant while he was working at Swartwood Hess. The Plaintiff's engagement of Hanna's services allegedly came about upon assertions by Halaby that Hanna's brother was a very successful stockbroker who would monitor the Plaintiff's account.

4. The Plaintiff has alleged that beginning in June of 1988, while the Debtor was employed at Moran, he began to execute trades on her account without first obtaining her consent. She further alleged that the Debtor's excessive and unauthorized trading resulted in substantial monetary losses to her account.

5. In July of 1989, the Plaintiff commenced an action against both the Debtor and Moran. The complaint was submitted to arbitration and was heard by a three member arbitration panel of the National Association of Securities Dealers ("NASD"). The complaint alleged a laundry list of instances where the Debtor either executed trades in the Plaintiff's account without her prior authorization or failed to effect transactions as she had instructed. It contained eight separate claims for relief each seeking damages in the amount of $85,040.25 representing $65,868.82 for Plaintiff's losses, $16,804.41 for

---

**2.** Fed.R.Civ.P. 52 provides, in pertinent part, that "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon...."

**3.** Arndt Trial Transcript at 8 (hereinafter "Arndt Tr.").

**4.** *Id.* at 99–100.

**5.** *Id.*

**6.** The record is unclear as to where the Defendant was employed when he first became the Plaintiff's stockbroker. According to the Defendant's testimony, the parties initially transacted business at a firm called Swartwood Hess. The Plaintiff testified that the Defendant was working at Bear Sterns when he first became her broker. The Defendant did not refer to Bear Sterns as a place of employment.

commissions paid, and $2,367.02 for margin interest. Additionally, the Plaintiff sought interest, costs, disbursements, attorney's fees and such other relief as the panel deemed just and proper.

The first two claims were asserted against both the Debtor and Moran alleging that the conduct set forth in the complaint violated section 10(b) of the Act,[7] the rules and regulations promulgated thereunder, and constituted common law fraud. Plaintiff's third claim for relief, alleging breach of contract, was asserted against Moran only. Plaintiff's fourth claim for relief was based upon the alleged negligence and recklessness of both Moran and the Debtor. Although this claim is captioned in the complaint as being asserted "Against J.T. Moran,"[8] a careful reading of paragraphs 38 through 44 of the complaint reveals that these allegations were in fact asserted against both the Debtor and Moran.[9] Plaintiff's fifth, sixth, and eighth claims for relief were asserted against Moran only and are not relevant to the instant proceeding. The seventh claim for relief alleging violations of section III of the NASD Rules of Fair Practice, was captioned like the fifth claim as "Against J.T. Moran," but similarly, was also asserted against the Debtor.

6. Moran filed for voluntary protection under Chapter 11 of the Bankruptcy Code in 1990 and consequently Plaintiff's efforts to enforce her claims against Moran were automatically stayed by section 362 of the Code. Thus, the arbitration proceeded only as against the Debtor.

7. Beginning November 20, 1990, and continuing through February 27, 1991, the arbitration panel held three full days of hearings. During the course of these hearings, the Plaintiff testified as to her allegations of the Debtor's excessive and unauthorized trading activity. In support of these allegations, the Plaintiff offered into evidence her account statements and transcripts of a taped telephone conversation between herself and the Debtor during which the Debtor admitted trading without authorization. The arbitrators also heard the testimony of Mr. Gregory Adamo, the debtor's supervisor.[10] The Debtor was present during the arbitration hearings and was subjected to examination.[11] A transcript of the Debtor's testimony was submitted to this Court.

8. On August 1, 1991, the arbitration panel released the Award in favor of the Plaintiff against the Debtor for $85,040.25, the exact amount sought in the complaint. Plaintiff's claim for attorney's fees and interest was denied. However, the Debtor was assessed various fees and forum costs and was instructed to satisfy the assessment by reimbursing to the Plaintiff $500.00 she had previously deposited with the NASD and remitting the balance to the NASD. Thus, pursuant to the Award, the total amount due the Plaintiff was $85,540.25.

The case summary from the arbitration panel's decision reads as follows:

> Claimant, Joan Arndt, alleges that Respondent, Steven Hanna, made the following trades without authorization: 1500 Audiovox Corp., Cla; 1500 Cadnetix Corp.; 2500 UTS Intel Corp; 5000 Software Service of America. Claimant further alleges that Respondent negligently handled her account and failed to effect sale of 25 Midway Air calls options. Claimant contends that Respondent's conduct amounted to a

---

7. This section provides in pertinent part:
It shall be unlawful for any person, directly or indirectly, by the use of ... any facility of any national security exchange—

 . . . . .

(b) To use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the commission may prescribe as necessary....
15 U.S.C. § 78(j)(b) (1991).

8. Plaintiff's Notice of Motion dated December 8, 1992, Exhibit A at 6.

9. Plaintiff's Notice of Motion dated December 8, 1992, Exhibit A at 6–8 (¶ 38–44).

10. While the defendant's arbitration testimony was admitted into evidence during the subsequent trial in these adversary proceedings, Adamo's and the Plaintiff's testimony was not. According to counsel for the Plaintiff, Adamo's arbitration testimony was never transcribed because it was inaudible.

11. The Debtor was subjected to direct, cross, redirect, and recross examinations.

violation of Section 10(b) of the Exchange Act and the rules and regulations promulgated thereunder and constituted common law fraud. Claimant asserted claims against Respondent's employer, J.T. Moran, which subsequently filed for bankruptcy protection. Thus claimant chose to proceed against Hanna only. Plaintiff's Exhibit 1.

It is undisputed that the Defendant neither appealed nor contested the Award. Furthermore, he made no payments toward satisfying the Award.

9. In September of 1991, the Plaintiff petitioned the Supreme Court of the State of New York for judgment confirming the Award and directing that judgment be entered thereon.[12] Such relief was granted on January 15, 1992. However, in the interim, on December 11, 1991, the Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code and sought to have the Award discharged in bankruptcy.

10. On March 27, 1992, the Plaintiff commenced the instant adversary proceeding seeking a determination that the Award is nondischargeable pursuant to section 523(a)(2)(A) of the Code, which provides in pertinent part that "[a] discharge ... does not discharge an individual debtor from any debt ... for money property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A).

11. As has already been noted, the Plaintiff moved for summary judgment, which Plaintiff contended, was warranted because of the absence of any genuine issue of material fact. That motion, based on Res Judicata and Collateral Estoppel, was denied by this Court on the grounds that Plaintiff failed to conclusively establish that the arbitration

award was based on fraud. The Court ordered that a trial be held to determine dischargeability under 523(a)(2)(A) (the "trial").

### Facts Relating to the Transactions Between the Parties

12. The parties, who never met in person, transacted all business telephonically. As previously stated, their relationship began while the Defendant was employed at Swartwood Hess,[13] the Defendant then having moved on, with the Plaintiff as client, to Phillip Appel and then to Moran in May or June of 1988. Approximately $100,000 was transferred into this account from Plaintiff's previous account at Phillip Appel. Although the Plaintiff was married, only her name appeared on the Moran account.

13. By February 1989, Plaintiff's account had been reduced to the extent that approximately $4,000 was left.

14. The Debtor, in his capacity as stockbroker, employed by stockbroker Moran, was entitled to receive commissions for transactions made on the Plaintiff's account. He testified that he received commissions on all of the transactions he performed for the Plaintiff with the exception of trades involving shares of Cadnetix on June 25, 1988 (See infra ¶ 20). The Defendant further testified that he discounted the commissions on all of the Plaintiff's transactions.[14]

15. The Plaintiff testified that she was happy with the Defendant's performance for the first year and a half that he was working as her broker.[15] Up until that point (June of 1988), she testified that the Defendant never made any unauthorized transactions nor applied any sales pressure tactics.

16. The Defendant acknowledged at trial that he was required to gain authorization from the Plaintiff prior to effecting any transactions on her account,[16] and that this

---

**12.** This petition contained no mention of fraud as the basis for the arbitration award. Instead, the petition asked for "the amount due as damages from Respondent [Hanna] to Petitioner [Arndt] by reason of the alleged breach of ... contract." Defendant's Exhibit C.

**13.** See supra note 6.

**14.** Hanna Trial Transcript at 89 (hereinafter "Hanna Tr.").

**15.** Arndt Tr. at 95.

**16.** Hanna Tr. at 24, 55.

was the general course of conduct.[17] He further acknowledged that during the period he was employed at Moran, he did in fact fail to get such authorization on certain transactions, as was reflected in the testimony taken in the arbitration hearings as follows:

*Arbitrator:* Were you aware that you should have gotten the permission of Ms. Arndt before you did the trade?

*Hanna:* Was I aware of it? I am always aware of it. . . .[18]

In the trial before this Court, the Defendant testified as follows:

*Question* [By Patricia A. Deegan, attorney for the Plaintiff]: So it is your testimony today that you did, in fact do unauthorized trading on Joan Arndt's account?

*Answer:* Yes.

*Question:* And is it your testimony today that you did a couple of unauthorized trades on Joan Arndt's account?

*Answer:* Yes.[19]

The Defendant also made this concession during a taped telephone conversation he had with the Plaintiff on February 13, 1989. A transcript of this conversation was admitted into evidence, during the course of the trial in this Court, as Plaintiff's Exhibit 5.

17. Although the Defendant conceded to participating in some unauthorized transactions, the parties do not agree as to which transactions were done without the Plaintiff's prior approval. According to the Defendant's trial testimony, the only transaction he is sure of doing without the Plaintiff's prior consent was the purchase and sale of shares of Go Video on July 22, 1988.[20] The Defendant also testified that there was a 50% chance that the Cadnetix purchase on July 25, 1988 was also unauthorized.[21]

The Defendant's testimony regarding unauthorized transactions fluctuated between the arbitration hearing and trial. Claiming that he had made a mistake during his arbi-

tration testimony, the Defendant stated at the trial that another purchase of Go Video, on July 25, 1988, was undertaken *with* the prior approval of the Plaintiff.

*Question* [Deegan]: So after reviewing your testimony, Mr. Hanna, of the hearing, is it your testimony today that the Go Video purchase of July 25th was in fact authorized?

*Answer:* Yes.

*Question:* And that was authorized together with the Lymphomed and Cadnetix is that correct?

*Answer:* I wasn't sure about Cadnetix.

*Question:* Well, if you weren't sure about Cadnetix that was traded on the same exact date as the other two, how did you get permission for the first two and not Cadnetix?

*Answer:* It's possible.

*Question:* How is that possible?

*Answer:* I spoke to her on the other two transactions, and I didn't speak to her on Cadnetix.

*Question:* All on the same day?

*Answer:* If it was on the same day. I don't know if it was done on the same day. I'm not sure of that.[22]

Finally, the defendant testified in this Court that the Plaintiff was happy with the Go Video trade on July 22, 1988, even though it was unauthorized, because she made a profit.

18. The Plaintiff did not refer to Go Video as an unauthorized transaction in her arbitration complaint nor did she claim it to be unauthorized at trial.[23]

19. At the trial, the Plaintiff alleged that the following securities were traded without her authorization during the seven month period of June 1988 to December 1988: Au-

---

17. *Id.* at 55.

18. Hanna NASD Transcript at 16 (hereinafter "Hanna NASD Tr.").

19. Hanna Tr. at 31.

20. Hanna Tr. at 25, 30–32.

21. *Id.* at 30–32.

22. Hanna Tr. at 43.

23. Go Video is not mentioned at all by the Plaintiff during the trial in this Court.

diovox, Kimberly Clark, Cadnetix,[24] Midway Air, Intel, Software Service of America (SSOA).

The Plaintiff testified that she became aware of these transactions almost immediately after each one was completed.[25] In addition, each one of these transactions resulted in a loss for the Plaintiff.

20. Upon learning of the Cadnetix purchase on July 25, 1988, the Plaintiff contacted Mr. Devita, a manager at Moran, to complain. This communication, apparently done through the Defendant,[26] resulted in the Defendant's commission for the Cadnetix purchase being revoked by Devita. Plaintiff testified that she had attempted to reach Devita directly on several other occasions but could never do so.[27]

21. Unlike the other securities which the Plaintiff had purchased in the past, the transaction involving Midway Air, on October 13, 1988, involved option calls. Plaintiff testified that prior to this transaction she had never spoken to the Defendant about options.[28] She further claimed that she never gave authorization to purchase the calls,[29] nor did she ever enter into or sign an options agreement.[30]

The Plaintiff offered into evidence, as Plaintiff's Exhibit 7, a document entitled "options agreement," dated October 14, 1988, which contained what was purported to be the Plaintiff's signature as well as certain "Customer Information." The Plaintiff testified that the signature on the document was not hers and that there were several inaccuracies on the document regarding her personal information. This document also bore the signature of the Defendant. The Plaintiff testified that she did not know who prepared this document or signed her name to it.[31]

The Plaintiff further testified that she did not complain to Moran's management following the Midway Air transaction.[32]

22. The Plaintiff testified that when the Defendant called her at work in early December of 1988 to discuss an Intel transaction, she specifically told him not to do anything. The Plaintiff alleges that in spite of these assertions, the Defendant made the transaction anyway. The record is unclear, however, as to whether the alleged unauthorized transaction involving Intel was actually a buy or sell. According to the Plaintiff's arbitration complaint, "Hanna sold 2500 UTS Intel Corp. [shares] ... without Claimant's authorization." Plaintiff's NASD complaint. Plaintiff's subsequent testimony at trial,[33] as well as her Post–Trial Memorandum of Law, refer to an unauthorized purchase of Intel. Furthermore, the Plaintiff also stated at the trial that she did not remember testifying in front of the arbitration panel that the Intel "purchase" on December 6, 1988 was authorized.

23. Following the Intel transaction, the Plaintiff spoke to Greg Adamo, then the Defendant's supervisor, regarding her account. The Plaintiff testified that as a result of this conversation, all transactions performed by the Defendant would first have to be discussed with, and approved by, Adamo.[34] During a subsequent telephone conversation

---

24. Plaintiff also testified that additional shares of Cadnetix were subsequently purchased the following day, July 26, 1988. Although she originally claimed that this purchase was also unauthorized, Plaintiff later testified that she was aware of this purchase and did in fact authorize it. However, Plaintiff also claims that she was "pressured" into doing so because the stock had dropped two points and she needed additional shares to average down.

25. Arndt Tr. at 112.

26. Arndt Tr. at 125.

27. *Id.* at 127.

28. *Id.* at 29–30.

29. In the Plaintiff's NASD complaint, Midway is not listed as an unauthorized purchase. Rather, the complaint alleges that the Defendant failed to effect a sale of the Midway Air Calls after being instructed to do so.

30. Arndt Tr. at 31.

31. Arndt Tr. at 48.

32. *Id.* at 31.

33. *Id.* at 121.

34. Arndt Tr. at 32.

with the Defendant, the Plaintiff authorized the purchase of shares of SSOA allegedly under the assumption that Adamo had given his approval of this transaction.[35]

When asked whether she had assumed that Adamo had approved the purchase of SSOA, the Plaintiff responded as follows:

> *Answer:* Yes I did. I asked him [Hanna] and I suspected that he had said yes. I don't really remember because in my mind, I could have said hearing yes or not hearing yes, but expecting that to be yes.

> . . . . .

> *Question* [By Daniel Crupain, attorney for the Defendant]: You assumed on January 18th that Adamo had approved, otherwise why would Hanna be calling you?

> *Arndt:* Because nothing was supposed to happen on that account without approval. Mr. Hanna knew that also.[36]

At the arbitration hearing, the Defendant did testify that he was supposed to converse with Adamo before making any trades but that he did not do so before buying SSOA because Adamo was away.[37] The Defendant initially reaffirmed this testimony at the trial before this Court. However, he subsequently testified that, although he had discussed the Plaintiff's account with Adamo, there was never any agreement to get his approval before a transaction.[38]

24. The Defendant testified that the transactions involving Audiovox, Intel, SSOA, and Kimberly Clark were not unauthorized. Furthermore, the Defendant initially stated that the Cadnetix purchase was authorized, only to partially recant this testimony later. *See* ¶ 15.

25. Although the Plaintiff objected to the unauthorized transactions on her account, none of these transactions were ever canceled by her. Furthermore, at no time did she ever make a written complaint to Moran's management or anyone else while Hanna was her broker. In addition, she never closed her account nor tried to switch brokers. She testified that she tried calling on several occasions but found it very difficult to get through.

26. The Plaintiff also testified several times that she "trusted" Hanna, believing that he was being supported by knowledgeable individuals such as his brother and cousin.

> *Arndt:* All right. To be honest with you, the thought was in my mind to close the account. I didn't know what to do. I had nobody to call. Then I thought that I was wrong. I was seeing all this transpiring, and I kept thinking about this cousin of his and the honesty that prevailed. The woman is a Dean at my University. I kind of figured good stock and things that—I did a lot of praying then.

> *The Court:* A lot of what?

> *Arndt:* A lot of praying that things would come to, I guess, a Poly Anna [sic] attitude. I don't know, but that is exactly where I was. I considered—I just didn't know what to do. I had other things on my mind. I had children to take care of. I had school. *I figured this thing will work itself out.*[39]

27. The Plaintiff also alleged that during the period of June 1988 to December 1988, she authorized certain transactions, involving shares of Xtra Medic, Nova and Miniscribe, only because of "sales pressure" placed on her by the Defendant.[40]

> *Question* [Deegan]: With respect to your actual dealings with what actually happened during that six or seven month period, can you tell us his general course of conduct during that time?

> *Arndt:* During that time, you see I just didn't know what the word attorney was, but a lot of transactions were made and the portfolio kept dropping to a very small amount. There was pressure on me. He

---

35. *Id.* at 31, 112.

36. Hanna Tr. 111–12.

37. Hanna NASD Tr. at 45.

38. Hanna Tr. 60–61.

39. Arndt. Tr. at 101–2 (emphasis added).

40. These transactions were characterized in Plaintiff's NASD Complaint as being a result of "the Defendant's negligent, careless and/or intentional conduct."

would call at times and say, the market is closed. We have to do this to recover. We lost this money. He would call me at school, and I would be on the way to class, and I really couldn't talk, or you know, close to closing time of the market this has to be done. This is the only way. I just trusted. I thought that he knew what he was doing.[41]

The Plaintiff testified that as her portfolio was dropping, the Defendant would pressure her into authorizing certain transactions by stating that, "We made money on it once. Let's get into that to recoup all the money that we lost."[42]

The Defendant denied pressuring the Plaintiff or ever rushing her off of the phone except for those situations where it was necessary to get a sale or purchase order in at a good price.[43]

28. The Plaintiff has also alleged that the Defendant traded excessively on her account, in effect, "churning" the account, in order to increase his commissions. The Defendant has denied such allegations. He testified at both the arbitration hearing and trial as to what he considered to be "excessive trading."

*Hanna:* I don't think 50 is excessive, since the previous year she made money from 50. So I don't think its excessive.

*Question* [By Victor Mevorah, Plaintiff's attorney at the arbitration hearings]: So in your mind then, its not the number of trades that make it excessive, but whether or not the person profits from it?

*Hanna:* Yeah.

*Question:* Basically, if I understand your feeling in general, and with respect to Mrs. Arndt, if in one year you did what you would normally categorize an excessive amount of trading, but the person made money, you wouldn't call it excessive?

*Hanna:* Right.[44]

41. Arndt Tr. at 11–12.

42. *Id.* at 23.

43. Hanna Tr. at 83.

44. Hanna NASD Tr. at 49.

When subsequently asked whether making eight or nine trades within a six day period on an account similar to the Plaintiff's would be excessive, the Defendant responded that it depended on more than just a profit:

I mean if you are just selling to buy again and writing commissions and not seeing any profits, a total lack of interest for the client then I would say eight or nine trades is excessive, but it really depends on the situation.[45]

The Defendant admitted that during the period of June 10, 1988 to June 16, 1988 he did, in fact, make eight or nine trades on the Plaintiff's account. However, in his opinion this activity was not excessive.

The record reveals that prior to June 1988, the Plaintiff was aware of, and authorized, several short term transactions.

*Question* [Crupain]: You knew that some of the stocks that were traded during the year and a half that preceded this June 1988 until the end fiasco, some were held for short periods of time and some were held for longer periods of time; is that right?

*Arndt:* Yes.

*Question:* January 6 of 1988, you bought a stock, Lillian Vernon, on the 6th and sold it on the 7th and you made a profit?

*Arndt:* Yes.

*Question:* You were happy about that transaction; is that right? You made a profit.

*Arndt:* You are always happy about making a profit. I don't know why that is questionable.

*Question:* There were other transactions reaching back through these years prior to 1988, June of 1988, in which you bought and sold quickly and made a profit?

*Arndt:* And made a loss also.[46]

29. The parties disagree as to the extent of the Plaintiff's trading prowess at the time she became involved with the Defendant.

45. *Id.* at 72.

46. Arndt Tr. at 108.

The Defendant testified that his knowledge of the Plaintiff's trading history was based on the sole transaction she had previously undertaken with the Defendant's cousin, Jim Halaby. This transaction involved approximately $5,000 worth of a penny stock which, according to the Defendant, are risky by nature. Although he testified that he didn't know how conservative or sophisticated she was, he did not consider her a novice because of this previous experience.

30. The Plaintiff testified to having very limited investment experience when she opened her account with the defendant,[47] although she also testified that she was well aware of the risks involved in trading in the stock market. She further acknowledged that she had purchased stocks in the past with her husband but that he had handled all of the transactions and she had nothing to do with "that end of it."[48]

31. Subsequent to his dealings with the Plaintiff, the Defendant was eventually fired from Moran. He testified that this occurred because he did not push the house stocks which it (Moran) wanted him to support. Nothing in the record suggests that the Plaintiff's complaints had anything to do with the Defendant's dismissal.

32. Upon leaving Moran, the Defendant joined the firm of Barrett Day. According to the Plaintiff, once there the Defendant called her up with the intent of soliciting new business from her. The Plaintiff testified that during this conversation the Defendant once again promised that he would not undertake any transactions without her prior approval. The record reveals that the Plaintiff did not open an account at Barrett Day.

### DISCUSSION

Section 523 of the Bankruptcy Code directs that certain types of debts are excepted from discharge. In particular, Section 523(a)(2)(A) of the Code reads as follows:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

. . . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

Section 523(a)(2)(A).

The Plaintiff bears the burden of proving that a debt is nondischargeable under section 523(a)(2)(A). *Barristers Abstract Corporation v. Caulfield (In re Caulfield)*, 192 B.R. 808, 819 (Bankr.E.D.N.Y.1996); *Farina v. Balzano (In re Balzano)*, 127 B.R. 524, 529 (Bankr.E.D.N.Y.1991) (*citing Benich v. Benich (In re Benich)*, 811 F.2d 943, 945 (5th Cir.1987)). The standard of proof by which this must be accomplished is preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 289–91, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991) ("[W]e hold that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard."). *See also Caulfield*, 192 B.R. at 819 ("This standard fairly balances the conflicting interests resulting from the provisions of the Code which discharge a Chapter 7 debtor from his pre-petition debts. A discharge is meant to provide an insolvent debtor with a 'fresh start'; the exceptions to discharge are designed to limit that ideal to the 'honest but unfortunate debtor.' ") (citations omitted).

In order to establish nondischargeability of a debt under section 523(a)(2)(A), a creditor must prove each of the following elements:

1. that the debtor made the representations;

2. that at the time the representations were made, the debtor knew them to be false;

3. that the debtor made the representations with the intent and purpose of deceiving the creditor;

4. that the creditor relied on such representations;

---

47. *Id.* at 5.

48. Arndt Tr. at 70.

5. that such representations were the proximate cause of creditor's loss.

See *Union Bank of the Middle East, Ltd. v. Luthra (In re Luthra)*, 182 B.R. 88, 91–2 (E.D.N.Y.1995); *N.Y.C. Housing Authority v. Gadsden (In re Gadsden)*, 128 B.R. 45, 47 (Bankr.E.D.N.Y.1991); *Balzano*, 127 B.R. at 530. Pursuant to the Congressional intent regarding exceptions to discharge (i.e. fresh start), all evidence presented must be narrowly construed against the creditor and liberally construed in favor of the debtor. *See Taneff v. Hoehn (In re Taneff)*, 190 B.R. 501, 505 (W.D.N.Y.1996) (*citing In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir.1987)).

The Plaintiff's first two claims against the Debtor as submitted to the arbitrators alleged that his conduct violated federal securities laws and constituted common law fraud. This Court has previously held that "[t]he similarities in the elements of common law fraud and section 10(b) of the Act render the analysis of factual questions the same." *Hanna*, 163 B.R. at 925 (citations omitted). Furthermore, it has also been held that the elements of common law fraud and the requirements of section 523(a)(2)(A) so "closely mirror" each other that they were "sufficiently identical" for the purpose of collateral estoppel. *Id.* (*citing St. Laurent v. Ambrose (In re St. Laurent)*, 991 F.2d 672, 676 (11th Cir.1993)).

The Plaintiff's request for relief is predicated on the following allegations of fraudulent conduct: (i) That the Defendant traded several times on the Plaintiff's account without authorization despite repeated assurances to the contrary; (ii) that the Defendant employed pressure tactics in dealing with the Plaintiff, forcing her to commit to transactions; and (iii) that the Defendant's excessive trading on the Plaintiff's account amounted to churning under Rule 10b–5 of the Act.

*Unauthorized Transactions*

■ It is undisputed that the Defendant was obligated to obtain the Plaintiff's permission prior to initiating any transactions on her account. The Defendant even admitted that this was the "general course of conduct." In spite of this, however, the Defendant also admitted that during the time he was handling the Plaintiff's account at Moran, he did in fact enter into unauthorized transactions involving Go Video and Cadnetix. The Defendant claims that his reasons for acting in such a manner were proper; he could not contact the Plaintiff but thought it was in her best interest to make the transactions.

By contrast, during the course of her testimony, the Plaintiff enumerated a series of transactions involving securities such as Audiovox, Kimberly Clark, Cadnetix, Intel, etc., in which the Defendant allegedly failed to obtain prior approval. The Plaintiff maintains that these transactions were all done with the express purpose of increasing the Defendant's commission and that in each case she suffered a loss. Furthermore, she alleges that over the course of the seven month period in which these transactions were occurring, the Defendant expressed, on at least five (5) separate occasions, that he would not trade without her authorization.[49] Accordingly, the Plaintiff argues that these repeated assurances and the aforementioned series of unauthorized transactions, amounted to fraud under section 523(a)(2)(A). As she contends, "[t]he issue before this Court is not whether the Defendant knowingly committed fraud, it is a question of how many times the fraud was perpetrated by the Defendant." *See* Plaintiff's Post–Trial Memorandum of Law at 12. This Court is of the opinion that the Plaintiff has failed to properly support this contention.

In spite of Plaintiff's assertions that the Defendant repeatedly misrepresented himself during the period in question, it is only her contentions as contained in her testimony, without any evidence to the contrary, that supports such a claim. There is but one clear instance where it appears that the Defendant did in fact state that he would get Plaintiff's approval prior to initiating any transactions and this was during the parties' February 1989 telephone conversation. However, this conversation transpired after the alleged unauthorized transactions had occurred and, therefore, does not validate the Plaintiff's claim that she relied on the Defendant's statements. The Plaintiff has failed to

---

**49.** Arndt Tr. at 119.

proffer any other evidence that the Defendant promised he would not trade without her authorization during the period of June 1988 to December 1988.[50]

Furthermore, except for those transactions which the Defendant has acknowledged as being unauthorized, i.e. Go Video and Cadnetix, the Plaintiff has failed to satisfactorily demonstrate that the other complained of transactions were also unauthorized. Indeed, as the record suggests, the Plaintiff's testimony is not clear as to whether some of the transactions she complained of were purchases or sales.

The second and third prongs of the "fraud test" require the Plaintiff to prove that at the time the Debtor made a promise or representation, he knew that it was false and did so with the intent not to perform as required. *Balzano,* 127 B.R. at 531. In this case, the Plaintiff claims that Defendant's repeated assurances and numerous unauthorized transactions, in conjunction with the $17,000 in commissions allegedly earned from said transactions, is blatant proof that the Defendant had no intent of abiding by his word.

■ Logically, a permissive inference is almost a necessity when trying to establish scienter, since proof of a debtor's state of mind is, in most cases, not readily available. *See Balzano,* 127 B.R. at 531 ("Fraudulent intent may be inferred; it cannot be presumed."); *Kuper v. Spar (In re Spar),* 176 B.R. 321, 328 (Bankr.S.D.N.Y.1994) (inference of scienter derived from totality of circumstances because debtor's state of mind not generally available); *see also In re Van De Water,* 180 B.R. 283 (Bankr.D.N.M.1995). "The permissible inference will be negated where the debtor comes forward with some evidence that he did not intend to deceive the Plaintiff." *Spar,* 176 B.R. 321 at 328. In *Balzano,* the debtor made payments to the lender up until the point he could no longer afford to do so. The court considered these payments as evidence which was "indicative of [the] debtor's lack of fraudulent intent." *Balzano,* 127 B.R. at 531. Although the

Plaintiff's allegations may also lead to an inference of fraudulent intent by the Defendant, Hanna, it too may be similarly negated.

The Defendant was entitled to receive commissions for all transactions performed on the Plaintiff's account and, with the exception of Cadnetix on July 25, 1988, the Defendant did, in fact, receive all such commissions. The Cadnetix commission was revoked following the Plaintiff's complaint to Devita, the Defendant's supervisor. Although the record is unclear as to exactly how much the Defendant lost because of this, the reasonable inference to draw from this revocation is that the Defendant had clear motivation and intent *not* to effectuate any future unauthorized transactions for fear of losing additional commissions. According to the record, following Cadnetix, no other complaints were made to Moran which resulted in the Defendant losing a commission. What purpose would the Defendant have in continuing in such a fashion if he believed that he would garner no benefit by doing so?

Finally, it is undisputed that in the one and a half year period leading up to the problems at Moran, the Defendant always obtained authorization before initiating transactions. Even if one were to believe that this prior course of conduct could be treated as some sort of an "implied representation," nothing presented to this Court suggests that the Defendant created such an implication with the purpose and intent of deceiving the Plaintiff.

■ Under the fourth prong of the 523(a)(2)(A) nondischargeability test, the Plaintiff is required to show that she relied to her detriment on the false representations of the Defendant. Based upon the recent Supreme Court decision of *Field v. Mans,* —— U.S. ——, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), the standard to be employed is now justifiable, as opposed to reasonable, reliance. *Id.* at ——, 116 S.Ct. at 446. The difference is that "the former is a subjective

---

50. The Defendant did testify that he was "not gonna do anything again" after the Plaintiff became irate about the Cadnetix transaction and complained to his manager. Hanna NASD Tr. at

52. However, the record is unclear as to whether this intention was actually verbalized to the Plaintiff.

standard, whereas the latter is an objective standard of conduct." *Fellows, Read & Associates, Inc. v. Rieder*, 194 B.R. 734, 737 (S.D.N.Y.1996). "Justification is a matter of the qualities and characteristics of the particular case, and the circumstances of the particular plaintiff, rather than of the application of a community standard of conduct to all cases." *Field*, — U.S. at —, 116 S.Ct. at 444 (*quoting* RESTATEMENT (SECOND) OF TORTS, § 545A (1976)). Regardless of the standard applied, and even if the Defendant did indeed represent that he would not trade without authorization, the record still demonstrates that Plaintiff's reliance was neither reasonable nor justifiable.

The Plaintiff's concern for her account is contradicted by her reaction to the Defendant's alleged endeavors. The Plaintiff testified that during the period in which all of the "unauthorized activity" was taking place on her account, she received monthly statements from Moran as well as confirmation slips after each transaction. Furthermore, she testified that she became aware of each of the unauthorized transactions almost immediately after they had occurred. With this knowledge, the Plaintiff was clearly aware of the status of her account and, therefore, could have easily mitigated her losses early on by demanding that either Hanna be taken off of her account or by having her account closed. Instead, over the course of the 7 month period she has called into question, the Plaintiff only complained to Moran's management twice, and never once sent a letter of complaint. Furthermore, inasmuch as the Plaintiff may have been a novice when she first encountered the Defendant, by the time the alleged problems occurred, she had experienced at least one and a half years of trading with the Defendant. At some point, this Court believes, naivete is no longer an excuse.

Finally, even if the Plaintiff did justifiably rely on an assertion by the Defendant that he would not trade without her authorization, once the Defendant acted in a manner contradictory to this assertion, the Plaintiff must be considered as having been warned. Since the Plaintiff claims that the Defendant repeatedly ignored his promises not to trade without her permission, her continued involvement with the Defendant simply cannot be justified. By her own admission, the Plaintiff did a lot of praying, hoping that everything would just work out. As much as her reliance may have been well intentioned, it certainly cannot be deemed justifiable nor even reasonable.

*Pressured Transactions*

The Plaintiff alleged that three of the losses she sustained during the fall of 1988 were a direct result of the Defendant's pressure tactics. Specifically, the Plaintiff maintains that she only invested in Nova, Miniscribe and Xtra Medic because of sales pressure placed on her by the Defendant. As previously stated, the Defendant would allegedly urge the Plaintiff to make up for her increasing losses by buying another stock because "we had made money on it before." In addition, the Plaintiff claims that the Defendant would use the "time pressure" of the market to force her to commit to a transaction. Regardless of whether the Plaintiff's allegations regarding pressure tactics are true or not, this Court fails to perceive, and the Plaintiff fails to demonstrate, how such tactics would amount to a fraudulent act sufficient to deny discharge of the debt under section 523(a)(2)(A).

*Churning*

Although the legal criteria governing whether a broker is found to have churned an account is thorny, the rudimentary idea is simple: '... a broker, exercising control over the volume and frequency of trading, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account.'

*In re Thomson McKinnon Securities, Inc.*, 191 B.R. 976, 982 (Bankr.S.D.N.Y.1996) (*quoting Carras v. Burns*, 516 F.2d 251, 258 (4th Cir.1975)).

"Churning is a deceptive device within 10b [of the Securities Exchange Act of 1934]...." *Thomson McKinnon Securities*, 191 B.R. at 982. Generally, to satisfy a claim

under 10b–5,[51] the plaintiff must be the purchaser or seller of a security, "deceptive conduct" must have been employed in connection with said purchase or sale, and the defendant must have acted with scienter. *See Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1047–48 (2d Cir.1985), *vacated on other grounds,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731, *modified,* 800 F.2d 305. *and amended on reh'g,* 806 F.2d 17 (2d Cir.1986). Specifically, in order to succeed on a churning claim, the Plaintiff must prove that her broker: (i) acted with scienter; (ii) traded excessively on the account in light of "investment objectives and the character of the account"; and, (iii) exercised control over the account. *Thomson McKinnon Securities,* 191 B.R. at 982; *Lock v. Scheuer (In re Scheuer),* 125 B.R. 584, 590 (Bankr.C.D.Cal.1991). "Scienter in the churning context requires proof of fraudulent intent *or* a willful or reckless disregard for the interests of the claimants." *Thomson McKinnon Securities,* 191 B.R. 976 at 986 *(citing Franks v. Cavanaugh,* 711 F.Supp. 1186, 1191, n. 3 (S.D.N.Y.1989); *Moran v. Kidder Peabody & Co.,* 609 F.Supp. 661 (S.D.N.Y.1985), *aff'd,* 788 F.2d 3 (2d Cir. 1986)) (emphasis added). Furthermore, as the Second Circuit stated in *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983), "[c]hurning, in and of itself, may be a deceptive device under section 10(b), the scienter required by section 10(b) being implicit in the nature of the conduct."

 According to the Plaintiff, the Defendant's alleged act of churning her account virtually out of existence is tantamount to actual fraud as required by section 362(a)(2)(A). Plaintiff's Memorandum of Law at 14. This is incorrect. Although churning is of a deceptive nature, it may be considered to be fraud in law but not, actual fraud.[52] "While the gravaman of an allegation of churning is the existence of fraud, it refers to fraud in law." *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168, 171 (10th Cir.1974). *See also Hecht v. Harris, Upham & Co.,* 430 F.2d 1202 (9th Cir.1970) ("The gist of an allegation of churning is fraud in law and differs from common law fraud. Proof of a specific intent to defraud is unnecessary"). Fraud in law, or fraud implied in law, "may exist without imputation of bad faith or immorality," and therefore does not constitute actual fraud. 3 COLLIERS ON BANKRUPTCY, ¶ 523.08[5] (Lawrence P. King 15th ed.) (footnotes omitted). Actual fraud requires moral turpitude or an intentional wrong. *Id.* "[S]omething said, done or omitted with the design of perpetrating what is known to be a cheat or deception." *Id.* Actual, or common law fraud, requires "a specific or invidious intent to defraud." *Dzenits,* 494 F.2d at 171 n. 2. Since churning may be established without proving a specific intent to deceive, it may not be categorized as "actual fraud." Therefore, although proof of churning may be grounds for a valid claim under 10b–5, such proof is insufficient to deny dischargeability under 523(a)(2)(A).[53]

Moreover, it must be noted that the Plaintiff has failed to demonstrate that any of the elements of churning have been satisfied. Although she insists that the Defendant churned her account, nowhere does the Plaintiff explain how the Defendant traded

**51.** Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,
 (a) To employ any device, scheme or artifice to defraud;
 (b) To make any untrue statement of a material fact, or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or
 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**52.** "[Churning] is in the nature of a constructive fraud in that it is considered a scheme under Rule 10b–5, the essence of which is deception of the customer and reliance of the customer on the integrity of the broker." *Dzenits v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 494 F.2d 168, 171 (10th Cir.1974).

**53.** Proof of churning was successfully applied on a non-dischargeability claim where the debtor had knowledge of, or willfully disregarded that, his agents had made false representations to the plaintiff. *See Lock v. Scheuer (In re Scheuer),* 125 B.R. 584, 590–91 (Bankr.C.D.Cal.1991).

excessively "outside" the character of her account, nor how he assumed de facto control of her non-discretionary account. Furthermore, the Plaintiff failed to proffer any expert testimony in support of her churning claim. Therefore, even if scienter is "implicit in the conduct," *Armstrong,* 699 F.2d at 91, we cannot get to the mental state of the Defendant because the Plaintiff has failed to show such conduct.

For all of the aforementioned reasons, this Court is of the opinion that the Plaintiff has failed to prove that the judgment rendered by the arbitration panel of the NASD was entered against the Defendant for "obtaining money by false pretenses, false representations, or actual fraud." Furthermore, the Plaintiff has likewise failed to prove, from the trial conducted before this Court, that the Defendant obtained money by "false pretenses, false representations, or actual fraud."

### CONCLUSIONS OF LAW

1. This Court has jurisdiction of the subject matter of this proceeding under 28 U.S.C. § 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(I).

2. The Plaintiff, Joan Arndt, has failed to establish that her claim against the Debtor, Steven Hanna, in the amount of $85,540.25, is non-dischargeable under section 523(a)(2)(A) of the Bankruptcy Code.

SETTLE AN ORDER IN CONFORMITY WITH THIS OPINION.